[Crim. No. 160.   Third Appellate District.—September 22, 1911.]

## THE PEOPLE, Respondent, v. GIACOMO SAMPO, Appellant.

CRIMINAL LAW—MURDER—SUPPORT OF VERDICT.—It is held that the evidence not only sustains the verdict rendered of guilty of murder in the second degree, but that the evidence shows a deliberate cold-blooded murder, under circumstances devoid of the slightest semblance of excuse, and that the verdict should have been, under the evidence, guilty of murder in the first degree.

ID.—SUFFICIENCY OF INFORMATION—TECHNICAL OBJECTION—GENERAL DEMURRER PROPERLY DISALLOWED.—An information charging the offense of murder in the language of the statute is sufficient, and a general demurrer thereto was properly disallowed. The technical objection to the averment that defendants "did then and there willfully and feloniously and of malice aforethought kill and murder" the deceased, "a human being," because not inserting . the word "their" before the words . "malice aforethought," is addressed to

form rather than substance, and if at all tenable, should have been raised by special demurrer. It cannot be construed to mean that the malice alleged was that of any other person or persons not charged to have committed the act.

ID.—TRIAL—CHALLENGES TO JURORS FOR BIAS—WAIVER OF OBJECTION TO DISQUALIFICATION—ABSENCE OF ASSESSMENT.—Where at the opening of the trial the first objection interposed to jurors was that of actual or implied bias, such objection waived any objection to such jurors for disqualification on the ground that neither of such jurors was "assessed on the last assessment-roll of the county on property belonging to him."

ID.—CONSTRUCTION OF CODE—ORDER OF CHALLENGES—MANDATORY PROVISIONS.—The provisions of section 1087 of the Penal Code regulating the order of challenges for cause: 1. To the panel; 2. To an individual juror for a general disqualification; 3. To an individual juror for an implied bias; 4. To an individual juror for an actual bias—are mandatory and imperative, and are to be invariably followed.

ID.—"GENERAL DISQUALIFICATION"—DESIGN OF PENAL CODE—CONSTRUCTION WITH CODE OF CIVIL PROCEDURE.—The design of section 1087 of the Penal Code, in referring to the challenge "for a general disqualification," is to apply the provisions of section 198 of the Code of Civil Procedure, so far as they can be made applicable, in determining the necessary competency or qualifications of a juror to serve as such, and also the provisions of section 199 of the same code, that "a person is not competent to act as a juror who does not possess the qualifications prescribed by the preceding section."

ID.—APPLICATION OF CODES—MANDATORY PROVISIONS—STATUTORY POLICY.—The provisions of section 1087 of the Penal Code were intended to apply only to qualifications of the second class prescribed in subdivisions 1 and 4 of section 198 of the Code of Civil Procedure, which were established by the legislature upon a principle of policy, in requiring "a general disqualification" to be disclosed on the *voir dire,* and which are made mandatory, and are waived if not first presented.

ID.—OBJECTION TO NATURAL CAPACITY OF JUROR NOT WAIVED.—Where at any time, on the *voir dire* or on the general examination, it is made to appear that a juror lacks the natural capacity to serve, as enumerated in sections 2 and 3 of section 198 of the Code of Civil Procedure, the objection is not waived because not first presented, and it is the imperative duty of the court to excuse such a person from sitting on the jury, when the want of such natural capacity appears.

ID.—EVIDENCE—DECLARATION OF DEFENDANT AFTER BLOWS CAUSING DEATH—UGLY FRAME OF MIND.—Where there is evidence that de-

fendant's brother became very angry when deceased danced with a female witness, who testified that within less than a half an hour after defendant had inflicted the blows which caused his death, the defendant said to his brother: "Come on, brother, we might as well kill them all; we are not scared," her testimony to such declaration was admissible to show that defendant was in an ugly frame of mind, after inflicting the wound upon deceased which caused his death, and as implying a willingness to commit other crimes of a similar character.

ID.—EXHIBIT OF ROCK USED IN INFLICTING DEATH.—The court did not err in admitting in evidence as an exhibit in the people's case a large rock, upon which, according to the positive statement of witnesses, there were fresh blood stains, and which was proved to have been found on the spot where the trouble of defendant with the deceased occurred; it having been also proved by another witness that he saw defendant strike the deceased with a rock, and such rock was fully identified as being the one used by him. The rock itself, thus proved, constituted a pertinent circumstance with the other evidence in determining the guilt of the accused.

ID.—EXPERT EVIDENCE OF PHYSICIANS WHO EXAMINED WOUND.—Physicians, who had examined the wound inflicted on the head of the deceased, were competent to testify that the wound found thereon could have been inflicted by means of the rock exhibited in evidence to them. Opinions of medical doctors as to the means which might have been employed in producing wounds upon the human body are always receivable in evidence as those of experts upon that subject.

ID.—EVIDENCE OF OFFICER ARRESTING DEFENDANT—ADMISSIONS NOT A CONFESSION.—Evidence of a deputy constable who arrested the defendant that, in response to a question put to him immediately after the arrest, "You fellows had a fight outside in the road there, too, didn't you?" the defendant replied: "I think we did," was admissible not as a confession, but as a mere admission in the technical sense of the term, which might or might not be incriminatory in its effect, according to other circumstances proved in the case. It was not necessary to lay any foundation for such evidence or to show that the statement was voluntary.

ID.—VIEW OF PREMISES—DISCRETION OF COURT—BURDEN ON MOVING PARTY TO SHOW ABUSE.—The law vests in trial courts the discretion of allowing or disallowing a view of the premises or other physical objects in the case which it is impracticable to bring into court; and the burden is upon the moving party to show affirmatively that such discretion has been abused, which it is held has not been sustained in this case.

ID.—POWER OF VIEW TO BE EXERCISED WITH GREAT CAUTION.—The power vested in trial courts to order a view of the premises, under section 610 of the Code of Civil Procedure, is one that should be

exercised, if at all, with great caution and circumspection, lest more harm than good will result to the parties by thus receiving evidence out of the courtroom, or on a public street, as would have been the present case.

ID.—REQUESTED INSTRUCTIONS COVERED BY CHARGE.—Where the charge of the court covered every vital phase of the case, and the principles contained in instructions requested by the defendant were embodied in clear language in the charge of the court, there is no ground for complaint that they were not repeated expressly as asked.

APPEAL from a judgment of the Superior Court of Amador County, and from an order denying a new trial. Fred. V. Wood, Judge.

The facts are stated in the opinion of the court.

Spagnoli & Spagnoli, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, Deputy Attorney General, for Respondent.

HART, J.—The defendant and one Stefano Conte were jointly charged by information with the crime of murder. They were awarded separate trials, and the defendant, having been tried on said information, was found guilty by the jury of murder of the second degree.

The cause is brought to this court by an appeal from the judgment and from the order denying defendant's motion for a new trial.

No question is raised as to the sufficiency of the evidence to support the verdict, but it is claimed by the defendant for a reversal: 1. That the information does not correctly state the crime of murder and that, therefore, the demurrer thereto should have been sustained; 2. That the court erred in its rulings in disallowing challenges to certain jurors; 3. That certain rulings of the court involving the question of the admissibility of certain evidence were erroneous; and 4. That the rejection of certain instructions proposed by the defendant constituted serious and prejudicial error.

The homicide, or rather the difficulty which resulted in the death of the deceased a few hours thereafter, occurred in Drytown, Amador county, on the nineteenth day of Novem-

ber, 1910. The facts as disclosed by the evidence may thus
be stated:

The deceased, Stefano Pistone, a mere boy, of about the
age of nineteen years, was employed as a laborer in one of
the mines situated near Drytown. He had been in Amador
county for about one year, having gone directly to said county
from Italy, his native country. A family by the name of
Cavallero, consisting of the husband, wife and young daugh-
ter, Eva by name, and aged about fifteen years, resided in
Drytown, where they conducted a boarding-house. On the
afternoon of the nineteenth day of November, 1910, the de-
ceased went to Drytown and stopped at Cavallero's boarding-
house. At the boarding-house at the time of Pistone's arrival
there, were the defendant, his codefendant, Conte, and a
brother of the defendant. Nothing of importance occurred
between the parties named during the afternoon nor until
after the evening meal at the boarding-house had been served
and partaken of by all said parties. It appears that after
dinner had been served, a young man who was then stopping
at the house picked up and proceeded to play an old accor-
dion, whereupon it was suggested that "they have a dance."
This suggestion seemed agreeable and the brother of defend-
ant started to dance with the young daughter of the Cava-
lleros. Others of the party took a turn at dancing with the
young lady and finally the deceased danced with her. For
some reason, not made to appear very clear by the evidence,
when the deceased and the young lady were engaged in danc-
ing together, the defendant's brother, George Sampo, became
very much incensed and began using profane and abusive
language, "calling everybody names," as Eva Cavallero tes-
tified, and then attempted to strike the deceased. The latter
thereupon ceased dancing, and, saying that he did not want
to fight, left the house through the back door. About five
minutes thereafter, the defendant and his codefendant, Conte,
departed from the house through the front door. These
circumstances occurred somewhere in the neighborhood of
10 o'clock at night. At about that hour, a Mrs. Callandri,
who, with her husband, resided in their home, situated a dis-
tance of about sixty feet from the Cavallero boarding-house,
heard loud noises on the street in front of and near her home.
She had retired for the night, but upon hearing the noises,

arose from her bed and went out on the porch for the purpose of ascertaining the cause of the noises which had attracted her attention. It was, as she testified, a "bright, moonlight night," and when she reached the porch, she observed the defendant, the deceased and Conte in the street directly in front of her house and about forty feet therefrom. She was personally acquainted with the defendant and the deceased, but knew Conte only by sight. The defendant was engaged in striking the deceased on the head, while Conte was back of the latter and holding him. The deceased was all the time loudly exclaiming, "Please let me alone; I have nothing with you; don't hit me; let me alone, please." The defendant did not cease beating the deceased, saying that he would kill him, until one Burdisso made his appearance on the scene and made defendant drop a large rock with which he was striking deceased. While the defendant was striking Pistone the latter was in a stooping position, being held, as we have seen, by Conte. Burdisso first took hold of Pistone for the purpose of assisting him to the hotel, but the defendant again picked up the rock and made demonstrations indicating an intention of renewing the attack, when Burdisso again made him drop the rock to the ground and then, taking defendant by the arm, escorted him into the boarding-house. The deceased unsteadily walked to the fence leading from Callandri's house to Cavallero's, and, holding on to the fence, walked to the latter place, where he immediately went to bed and died early on the following morning.

Mrs. Callandri's husband, having also been attracted to the porch of their house by the noise, witnessed and heard all that the first named saw and heard of the difficulty, and corroborated his wife's testimony.

On the morning following the trouble as thus described, Mrs. Callandri went to the spot where the trouble occurred, and there she found a large rock upon which, according to her positive statement, there were blood stains which were yet fresh.

Drs. Endicott and Griffin made a thorough autoptical examination of the body of the deceased, and the two physicians concurred in saying that all the vital organs of the deceased, with the exception of the brain, were in a normal or healthy condition. They, however, found a linear or straight frac-

ture of the skull back of the right ear, and a large blood clot, approximately of the size of an ordinary baseball, pressing on the right side of the brain. As is manifestly true, they testified that the fracture caused the blood clot, and the pressure of the latter on the brain caused the death of Pistone. They gave it as their opinion that the fracture was produced by a blunt instrument of some character and could have been caused by means of the rock which Mrs. Callandri found lying on the spot where the affray occurred, said rock having been kept by the authorities and introduced in evidence.

The defense attempted to prove an *alibi,* and introduced some proof to that end; but it is very clear that this contention was erected and attempted to be sustained upon a very frail foundation. Assuming that the witnesses introduced by the people told the truth (and this court must presume that they did, since the jury must have believed them), the evidence so advanced amply sustains the verdict. Indeed, the evidence presented by the people discloses, in our judgment, a deliberate, cold-blooded murder—in truth, the destruction of the life of a mere boy under circumstances devoid of the slightest semblance of justification or excuse. If the testimony produced by the people is believable (and the jury must have believed it or they would have acquitted the accused) there was but one verdict which should have been returned, viz., murder of the first degree, and the defendant may, indeed, regard himself as having been extremely fortunate in having his fate submitted to a jury that could be persuaded, in the face of what appears to be conclusive evidence of his guilt, to believe that punishment less than the extreme penalty prescribed for the wanton and malicious taking of human life would afford adequate expiation for his diabolical act.

We shall now proceed to a consideration of the points made by defendant on this appeal in the order in which his counsel have presented them in their brief.

1. There is no merit in the claim that the information does not properly describe the crime of murder, and the demurrer thereto was, therefore, properly disallowed.

It is alleged that the defendants " . . . , did then and there willfully, unlawfully and feloniously and of malice aforethought kill and murder one Stefano Pistone, a human be-

ing,'' etc. The contention is that the charging part of said pleading is defective as descriptive of the crime of murder against the accused in that it does not allege that the said defendants ''did then and there . . . of *their* malice aforethought kill and murder,'' etc.—that is, that the information fails to charge that the defendants committed the crime sought to be charged with malice. The objection is addressed to form rather than to substance and, if at all tenable, should have been raised by a special demurrer. The information is, however, substantially in the language of the statute, and is, therefore, sufficient. It is very plain that, merely because of charging the act of killing to have been done ''of malice aforethought,'' without specifically declaring the ''malice'' thus charged to have been the ''malice'' of the accused, the information could not, by any possible torturing of language, be construed to mean that the ''malice'' so alleged was that of some person or persons not charged to have committed the act. And such would be the result of the construction which appellant gives the information in the respect referred to.

2. Many objections are urged against the rulings of the court in disallowing challenges interposed by the defendant for various causes; but the only ruling in this regard which, on first blush, appears to menace the judgment and order and to which, therefore, special attention is merited, involves the action of the court in disallowing the challenge to Juror Coffman upon the ground that he was deficient in one of the general qualifications which section 198 of the Code of Civil Procedure provides that a person must possess to render him competent to serve as a juror.

It appears that, after an exhaustive examination of Juror Hughes upon the question whether he was biased, a challenge was interposed by defendant to said juror on the ground of implied bias and denied by the court. Thereafter counsel for defendant asked the juror whether he was ''assessed on the last assessment-roll of the county on property belonging to him,'' and, receiving a negative reply, challenged him on that ground. The court disallowed the challenge on the ground that said challenge was not made in the order prescribed by section 1087 of the Penal Code, a challenge for implied bias having, as seen, been previously interposed and denied. The defendant used a peremptory challenge on said

juror and, before the completion of the jury, had used all the peremptory challenges allowed by law, in addition to the extra one allowed him by the court, the court having announced to counsel for defendant that it would give or accord to the defendant an extra peremptory challenge—that is, it would allow the defendant twenty-one peremptory challenges in lieu of twenty, the number to which a defendant in a capital case is entitled under the law.

Subsequently to the examination of Juror Hughes, counsel for defendant examined Juror Coffman at great length, and finally interposed a challenge to said juror upon the ground of actual bias, the same having been overruled by the court. Thereafter, counsel for defendant, by the further questioning of Coffman, developed the fact that he, too, was disqualified because of not being assessed "on the last assessment-roll of the county on property belonging to him," and challenged the juror on that ground. The court disallowed the challenge, and, in doing so, said: "It seems to me the counsel waived it when he made the challenge on the ground of actual bias. Now, I cannot see the use in consuming half an hour of time in examining into other matters, when the matter can be easily ascertained in the first place, whether the juror is on the last assessment-roll. The code provides specifically that challenges must be taken in a certain order." To which counsel for defendant replied: " . . . But I will say in regard to the matter of this challenge, we do not intend to challenge anybody upon the jury list because they do not possess these qualifications under section 198 of the Code of Civil Procedure, unless we find we do not want that juror on this jury. If we find out we do not want him, and can get him off on no other ground, we are going to get him off on this ground, just as we challenged him."

We think the court was right in holding that the defendant had, under the circumstances shown by the foregoing statement, waived his right to challenge the juror on the ground that he was not assessed on the assessment-roll, etc. Section 1087 of the Penal Code reads as follows: "The challenges of either party for cause need not all be taken at once, but they must be taken separately, in the following order: 1. To the panel; 2. To an individual juror, for a general disqualifica-

tion; 3. To an individual juror, for an implied bias; 4. To an individual juror, for an actual bias.''

The foregoing section was, of course, intended to achieve some purpose, and if it can be given effect without impinging upon any of the vital rights of parties to actions, which are tried by a jury, it is manifestly the duty of the courts to so construe and apply it as that it may be enforced in all proper cases.

It is very clear that the consideration which prompted the legislature to provide for the challenging of a person drawn as a juror for a general disqualification first in the order in which said section of the Penal Code declares that challenges to an individual juror shall be taken was to save time and expense in the trial of cases by jury, it being a matter of common notoriety that the examination of jurors upon the question whether they entertain bias, actual or implied, for or against either party or with reference to the case ordinarily consumes a vast amount of time. The design of the section was, therefore, to require litigants, in the matter of impaneling juries, to ascertain, first of all, whether persons drawn into the jury-box possess the general qualifications prescribed by section 198 of the Code of Civil Procedure and that, if grounds exist therefor, to challenge and thus get rid of such persons without taking up the time of the court, at great expense to the litigants, or to the county, if the case is one that involves the prosecution of a criminal charge, with a lengthy *voir dire* examination addressed to the question whether they do or do not entertain such personal opinions with regard to the case as would or would not prevent them from trying the issues of fact intelligently and with perfect fairness and impartiality.

The language of said section is, on its face, mandatory, and we think that, in so far as it can be made applicable to the provisions of section 198 of the Code of Civil Procedure, without actually invading the substantial rights of the parties to the action, the order therein prescribed for taking challenges ought to be held to be, as unquestionably it was intended to be, imperative and to be invariably followed.

Section 198 of the Code of Civil Procedure provides that a person is competent to serve as a juror if he be: ''1. A citizen of the United States of the age of twenty-one years, who shall

have been a resident of the state one year, and of the county
or city and county, ninety days before being selected and
returned; 2. In possession of his natural faculties, and of or-
dinary intelligence, and not decrepit; 3. Possessed of suffi-
cient knowledge of the English language; 4. Assessed on the
last assessment-roll of the county, or city and county, on prop-
erty belonging to him.''

Section 199 of the same code provides that ''a person is not
competent to act as a juror who does not possess the qualifi-
cations prescribed by the preceding section. . . . ''

It will be observed that by section 198 of said code there
are prescribed two distinct classes of qualifications to render
a person competent to serve as a juror, the one class resting
on an entirely different reason or principle from the other,
viz.: 1. Those qualifications which inhere in the mental capa-
city of a person to intelligently or at all discharge the duties
of a juror and which are set forth in subdivisions 2 and 3 of
said section; 2. Those qualifications, prescribed by subdi-
visions 1 and 4, which, in and of themselves, do not affect the
ability of a person to fairly, impartially and intelligently dis-
charge such duties, but which were established by the legis-
lature upon a principle of policy. The causes of challenge
for a general disqualification are, therefore, divided into two
classes founded upon like distinction, and it is our view that
the provisions of section 1087 of the Penal Code may and
were intended to apply solely to causes of challenge based
upon the want of the qualifications of the second class or those
that are prescribed by subdivisions 1 and 4 of section 198 of
the Code of Civil Procedure. This conclusion is fortified, we
think, by the following considerations: Where a person is
deficient in any of those qualifications prescribed by subdi-
visions 1 and 4 of said section 198—i. e., not a citizen of the
United States, of the required age, etc., or not ''assessed on
the last assessment-roll of the county on property belonging
to him''—the fact of such disqualification must be made to
appear, if disclosed at all, by the prosecution of a special in-
quiry to that end on his *voir dire* examination. In other
words, whether he is or is not shown to be incompetent to act
as a juror for wanting in any of those qualifications pre-
scribed by subdivisions 1 and 4 of said section of the Code of

17 Cal. App.—10

Civil Procedure depends entirely upon whether or not he is specifically questioned upon his *voir dire* with a view to the ascertainment of that fact. In the case, however, of a disqualification of a person for any of the reasons enumerated in subdivisions 2 and 3 of section 198 of said code—that is, where the person is not "in possession of his natural faculties," or not "of ordinary intelligence," or not "possessed of sufficient knowledge of the English language" to understand the testimony or to comprehend the general nature and purpose of the proceedings, or, in short, not capable of appreciating in a general way the duties of a juror—the fact of such incompetency would readily be discovered on a very brief and general examination of the juror. If he were deficient in those respects, his manner of answering questions propounded to him on his *voir dire*, if, indeed, he could answer them at all, would at once develop his incompetency by reason of such deficiency. But where, at any time during the course of the *voir dire* examination, such incompetency is thus made satisfactorily to appear, it would undoubtedly be the imperative duty of the court, regardless of whether a formal challenge was interposed on that ground, to excuse such person from sitting on the jury, for, manifestly, to knowingly permit a person so disqualified to act in the capacity of a juror would, in practical effect, amount to a distinct denial to the parties to the action of a trial by a legal jury, since a trial by a jury composed either in whole or in part of persons wanting in the degree of intelligence prescribed by the statute would be no trial at all. And herein lies another ground of distinction between those qualifications prescribed by subdivisions 1 and 4 and those of subdivisions 2 and 3 of section 198 of the Code of Civil Procedure. To permit a person to sit on a jury who is wanting in the general qualifications prescribed by subdivisions 1 and 4 would not, like a want of those qualifications prescribed by the other subdivisions of said section, necessarily result in *actual* prejudice to the party objecting to him, for it cannot be laid down as an abstract proposition that *actual* prejudice to the rights of parties to an action would necessarily follow from permitting either an alien or one not of the required age or a nonresident of the county within the purview of subdivision 1 of section 198 or one not assessed on the "last assessment-roll," etc., to serve as a juror. Ab-

stractly speaking, there is no reason why one not a citizen or
not of the prescribed age or not on the assessment-roll, as
required by the statute, should and would not make equally
as fair and impartial and as intelligent a juror as one so
qualified.   Obviously, as before shown, this cannot be true in
the case of a person incompetent because not possessing those
qualifications affecting his intelligence.

In view of the distinction thus pointed out between the
two classes of general qualifications essential to the compe-
tency of a person to serve as a juror, our conclusion is, as be-
fore declared, that the provisions of section 1087 are man-
datory in their application to subdivisions 1 and 4 of section
198 of the Code of Civil Procedure, but cannot apply to the
other subdivisions of said last-mentioned section and were not
intended to so apply.   The result of this conclusion is (to re-
peat) that, in impaneling a jury, it is the duty of the parties
to an action, whether civil or criminal, to first inquire whether
persons drawn into the jury-box possess the qualifications pre-
scribed by subdivisions 1 and 4 of section 198 of the Code of
Civil Procedure, and, if found deficient in any thereof, to
challenge them on that ground, and that, where they fail to
pursue such course and first challenge a person, without suc-
cess, on grounds involving particular causes of challenge, they
then forfeit or waive their right, at the cost, perhaps, of the
loss of a peremptory challenge, to challenge such person for
wanting in those qualifications prescribed by those subdi-
visions of said section.

It may be argued that to hold section 1087 to be applicable
to a part only of section 198 of the Code of Civil Procedure
involves a strained and unnatural construction of the first-
named section.   We do not think so.   Section 1087 of the
Penal Code was first enacted by the legislature of 1851 and
sections 198 and 199 of the Code of Civil Procedure by the
legislature of 1863.   All three of those sections were re-en-
acted in substantially their present form of language by the
legislature of 1872.   As previously declared, it must be as-
sumed that, in the enactment of section 1087 of the Penal
Code, the legislature had in mind the accomplishment of some
useful or beneficial purpose in the trial of jury cases, and
we must further assume that the legislature, when re-enacting
the three sections at practically the same time, recognized

and understood the proposition that said section could not, with reason, be made to apply to subdivisions 2 and 3 of section 198 of the Code of Civil Procedure. We must, therefore, assume that the section was intended to subserve that purpose only which it could with propriety and reason accomplish, and that, since it can with perfect propriety and the soundest reason apply to subdivisions 1 and 4 of the said section, such was the specific intention in and object of its enactment and re-enactment.

In the case at bar, it may be well to note, the defendant, apart from the consideration of the point under discussion in its legal aspect, has no cause for complaint. The court, it will be remembered, called the attention of his counsel to the provisions of section 1087 of the Penal Code when they challenged Juror Hughes for not being on the assessment-roll and long prior to the challenging of Coffman on the same ground. They displayed their defiance of the mandates of that section and of the opinion of the court with reference thereto by refusing to first inquire into the general qualifications of the persons in the jury-box, examined subsequently to the examination of Juror Hughes and, furthermore, by declaring that they did not intend to challenge persons for general causes unless such persons proved unsatisfactory to the defense and they were unable to exclude them from the jury on other grounds. Thus, we say, it is clear that from every standpoint from which the proposition may be viewed, the approval by this court of the ruling complained of only brings to the defendant consequences for which his own attorneys are alone responsible.

3. Eva Cavallero was permitted to testify, over the objection of the defendant, that within less than a half hour after he had inflicted the blows which caused the death of Pistone, the defendant said, addressing his brother, ''Come on brother, we might as well kill them all; we are not scared.'' It is now claimed that the ruling allowing that testimony was erroneous and damaging to the accused. There was, as we have seen, testimony showing that George Sampo, the defendant's brother, became very angry for some reason when the deceased started to dance with Eva Cavallero, and that he angrily used very ugly language at that time. The theory of the prosecution was that a general row was started in the

boarding-house at that time, and that thereupon the deceased left the house by the back door, and that immediately thereafter the defendant and Conte left the house by the front door; that their purpose was to overtake the deceased and punish him for some fancied insult to the defendant's brother, and that they did overtake Pistone and administer to him the beating already described. The declaration imputed to the defendant did not, of course, amount to a confession of his guilt of the crime charged against him, but was merely a statement indicating that he was in an ugly frame of mind immediately after the infliction upon the deceased of the wound which caused the latter's death, and, furthermore, as perhaps implying, according as the jury might view the declaration, that the defendant had either killed or attempted to kill some other person. We think the testimony here objected to was proper.

The court did not err in admitting in evidence as an exhibit in the people's case the rock to which we have hitherto referred as having been found by Mrs. Callandri, on the morning following the night of the difficulty, on the spot where the defendant administered the beating to Pistone. Burdisso declared that he saw defendant strike deceased with a rock, and Mrs. Callandri, as we have shown, testified that there were fresh blood spots on the rock, and in this she was corroborated by her husband. The rock was given into the hands of the officers shortly after it was picked up and was fully identified as the rock found and picked up by Mrs. Callandri. Moreover, the doctors testified that the wound inflicted upon Pistone's head appeared to have been produced by some blunt instrument and that it could have been caused by the use of the rock in question. Having been found at the very place where the beating occurred, with fresh blood stains thereon, and in view of the testimony of the physicians that the wound could have been made by means thereof, the rock itself constituted a pertinent circumstance, to be considered with the other evidence, in determining the question of the guilt of the accused.

Nor was it error, it may be observed in this connection, to permit the physicians to testify that the wound could have been inflicted by means of said rock. The physicians were not asked by whom the wound was inflicted, nor whether the

wound was caused by the use of the rock exhibited to them, but were simply asked whether, in their opinion, such a wound as the one they found on the head of the deceased could have been inflicted by means of the rock found by Mrs. Callandri. (*People* v. *Bowers* (Cal. Sup. Ct.), 18 Pac. 660; *People* v. *Olsen,* 1 Cal. App. 22, [81 Pac. 676].) Opinions of medical doctors as to the means which might have been employed in producing wounds upon the human body are always receivable in evidence as those of experts upon that proposition, and we know of no principle to which the admission of such testimony is repugnant. The manner by which a wound is produced is as much within the range of subjects as to which opinions of experts may be given in evidence as is the proximate or approximate cause of death, and no one will dispute the competency, as evidence, of the opinion of a physician as to the direct or remote cause of one's death.

It is next contended that the court erroneously allowed the witness Bona, a deputy constable, who arrested the defendant for the crime of which he was accused by the information herein, to give testimony of the reply the defendant made to the following question put to him by Bona, immediately after the arrest: "Giac, you fellows had a fight outside in the road there, too, didn't you?" The answer of the defendant to said question, and which it is claimed the court improperly allowed to be given in evidence, was: "I think we did." The objection to this testimony was that a proper foundation had not been laid for the introduction of proof of any declarations by the accused concerning the crime with which he is charged. The ruling was clearly correct. The statement proved by the witness was not a confession, but a mere admission, in the technical sense of the term, which might or might not be incriminatory in its effect, according to the other circumstances developed in the case, and it was, therefore, unnecessary to lay any foundation or to show that the statement was voluntary. The fact that he admitted having a "fight outside in the road," while a circumstance, where one is charged with actual, physical participation in the commission of the crime, tending to prove one of the essential elements of guilt—that is, that he was at the scene of the trouble when it occurred—did not constitute an acknowledgment of

guilt, for he might have had a fight and still be guiltless of the particular crime with which he is charged or of any crime.

We cannot sustain defendant's claim that the court's refusal to permit the jury to be taken to Drytown for the purpose of viewing the scene of the difficulty leading to Pistone's death is erroneous. The law vests in trial courts the discretion of allowing or disallowing a "view of the premises" or other physical objects relevant to the case which it is impracticable to bring into court, and whether, in any case, such discretion has been abused by a denial of a motion to permit such view, depends upon the circumstances upon which the order has been refused (Code Civ. Proc., sec. 610) ; and the burden on appeal is upon the moving party to affirmatively show that such discretion has been abused. There is no showing in the record here indicating an abuse of discretion in the respect referred to, and we must, therefore, assume that the course of the court was justified. It may be remarked that the power vested in trial courts by section 610 of the Code of Civil Procedure is one that should be exercised, if at all, with great caution and circumspection, lest more harm than good will result to the parties by thus receiving evidence out of the courtroom or perhaps on a public street, as would have been the case here.

We are asked to review certain exceptions to the rulings of the court permitting the district attorney to ask the defendant's witnesses, George Sampo and Stefano Conte, certain questions on cross-examination. We have examined these assignments, but, as the answers to the questions so asked were, if anything, invariably favorable to the defendant and innocuous in form, there is no necessity for specially reviewing them.

4. The defendant does not contend that, so far as it goes, the charge of the court is amenable to just criticism. Indeed, an examination of the instructions given by the court to the jury will at once disclose that, as to them, there is no ground for complaint. But the defendant does challenge the correctness of the action of the court in refusing to allow a large number of instructions proposed by him, the claim being that he was thus deprived of a full exposition to the jury of the law covering all the features of the case as disclosed by the evidence. We shall not review in detail here

the points thus made. It must be enough to say that the charge of the court fully covered every vital phase of the case, and that the principles contained in those of the rejected instructions that correctly stated the law pertinent to the important questions of fact developed by the evidence were embodied, in singularly clear language, in the court's charge.

We have given every point urged upon us by defendant the most critical consideration, and our conclusion is that the accused was accorded, as most certainly he had a right to expect, a perfectly fair and impartial trial.

For the reasons herein set out, the judgment and order are affirmed.

Chipman, P. J., and Burnett, J., concurred.