[Crim. No. 166.    Third Appellate District.—January 3, 1912.]

## THE PEOPLE, Respondent, v. STEFANO CONTE, Appellant.

CRIMINAL LAW—MURDER—QUALIFICATION OF JURORS—IMPLIED BIAS—CONTRADICTORY ANSWERS—PROVINCE OF COURT—DISCRETION—REVIEW UPON APPEAL.—Where, on the impaneling of a jury for the trial of a defendant charged with murder, some of the jurors, in reply to questions by defendant's counsel, stated that they would enter the jury-box with an opinion that the accused was guilty, or would throw the burden of proof on him, with other similar statements, and were challenged for implied bias, but upon being questioned by the district attorney, invariably replied that they would be governed by the law presented by the court, would presume the defendant innocent until his guilt was proved to their satisfaction, and would require the prosecution to establish his guilt beyond a reasonable doubt, under this state of the record, it was the province of the court to determine whether or not such jurors were disqualified for implied bias; and its discretion will not be disturbed upon appeal, if no abuse thereof appears.

ID.—ACTION OF JUROR IN OTHER MURDER TRIALS—PROPER DISALLOWANCE OF QUESTIONS—PRESUMPTION—PUBLIC POLICY.—The court properly disallowed questions for defendant to a proposed juror upon the present murder trial, as to the verdicts rendered in several other murder trials, upon which the juror had theretofore served upon the jury. Such action of the juror in other cases, or in any particular case, would not constitute a criterion by which his conduct as a juror in this case might be judged, though involving a similar charge. The presumption is that such former verdicts were based upon the evidence then before the jury; and it would violate public policy to permit such presumption to be set aside to show ulterior motives in reaching such verdicts.

ID.—IMPLIED BIAS—RELATION OF ATTORNEY AND CLIENT BETWEEN JUROR AND DISTRICT ATTORNEY—PROOF AT TIME OF TRIAL ESSENTIAL—GUESS OF JUROR—CHALLENGE PROPERLY DISALLOWED.—In order to sustain a challenge for implied bias, on account of the relationship of attorney and client between the district attorney and

a juror (assuming, without deciding, that such relationship comes within the terms of section 1074 of the Penal Code), it is not sufficient to show that such relationship previously existed, nor that it may be resumed in the future, but it must be affirmatively shown that it existed at the time of the trial. If the district attorney was then engaged in legal service for the juror, the challenger, by pushing the inquiry, could have proved it; but when he rested with the mere vague and indefinite "guess" of the juror "that he might be considered his attorney now," the challenge is not sustained, and was properly disallowed.

Id.—Reason for Ruling Disapproved—Relation of Attorney and Client Between District Attorney and Juror not a Ground of Challenge.—The reason for the foregoing ruling is disapproved. The proper answer to defendants' claim is that the existence of the relation of attorney and client between the district attorney and a juror is not a ground for challenge, under section 1074 of the Penal Code, which does not include such a case. (By the supreme court in bank, on order denying rehearing.)

Id.—Evidence—Means of Homicide—Bloody Rock—Exhibit—Expert Testimony—Broken Skull—Blunt Instrument.—The court properly admitted evidence that after the joint assault made by the defendant and his codefendant, separately tried, upon the deceased, a bloody rock was found near the scene of the homicide, and admitted the same as an exhibit, and also the expert evidence of physicians who knew that deceased had a broken skull, which must have been caused by some blunt instrument, which the rock exhibited was adequate to produce.

Id.—Evidence as to Murder With Rock—Eye-witnesses.—Evidence of eye-witnesses who saw the defendant holding the deceased, while his codefendant was beating him with a rock, is admissible, not merely as part of the *res gestae*, but as the most significant and direct proof that could be adduced, in support of the very transaction of murder charged against them; and it sufficiently establishes defendant's connection with and participation in the commission of the crime.

Id.—Evidence of Conspiracy to Murder—Difficulty in Boarding-house—Joint Departure of Codefendants Following and Killing Deceased.—Evidence that the defendant and his codefendant, separately tried for murder, had a joint difficulty with deceased in a boarding-house, and that after deceased left the house, the codefendants jointly departed therefrom, and jointly pursued, assaulted and killed the deceased, was admissible as tending to show significant and pertinent links in the chain of circumstances leading to the establishment of a conspiracy between the codefendants to murder the deceased.

Id.—Opening Statement of District Attorney—Correct Statements of Elements of Murder—Defendant not Prejudiced—Instruc-

TION.—Where the district attorney, in his opening statement, correctly explained to the jury the elements of the crime of murder, the defendant was not prejudiced thereby, especially when the court, upon the conclusion of such opening statement, emphatically warned and instructed the jury that they should not accept the law of the case from the counsel, but that it was their duty to be guided solely by the law as stated to them by the court.

ID.—LOSS OF VISIBLE BLOOD STAINS ON ROCK AT TIME OF TRIAL—EXPERT EVIDENCE OF PHYSICIAN—CHEMICAL ANALYSIS—COMPENSATION—PUBLIC FUNDS.—Where the rock exhibited, which was testified to have some blood thereon when found, had lost the visible appearance thereof at the time of trial, though the physician in attendance might be asked as to such visibility on his mere inspection, he could not be required, without compensation, to make a chemical analysis in order to qualify himself as an expert to testify whether there were blood stains on the rock. But the court properly declined, on motion of defendant's counsel, to order such compensation to be paid out of the public funds.

ID.—EXCLUSION OF OFFERED EVIDENCE OF INTOXICATION OF DEFENDANT NOT PREJUDICIAL—SOLE DEFENSE OF ALIBI—DELIBERATE MURDER.— The exclusion of offered evidence of intoxication of the defendant was not prejudicial, where the sole defense claimed was that of *alibi*, to which such evidence was not germane, and where the ruling, if erroneous, could not be prejudicial, in view of the evidence and the nature of the circumstances under which the assault was committed, disclosing a deliberate and cruel murder, so that the excluded evidence could not result in a miscarriage of justice; and it could not reduce the offense to manslaughter.

ID.—REASONS OF EXCLUSION DISAPPROVED—EVIDENCE CLEARLY ERRONEOUS—BEARING ONLY ON DEGREE OF MURDER—VERDICT OF SECOND DEGREE.—The reasons given for the exclusion of evidence of such intoxication are disapproved. Such exclusion was clearly erroneous. But the utmost effect of the evidence would be to exclude the idea of the deliberation and premeditation essential to murder of the first degree, and reduce the offense to murder of the second degree. The defendant was found guilty of murder of the second degree only, doubtless because of the testimony of other witnesses tending to show a degree of intoxication. For this reason, plainly, no prejudice was suffered by defendant because of the erroneous ruling. (By the supreme court in bank, on order denying rehearing.)

ID.—REFUSAL OF REQUESTED INSTRUCTIONS.—The court properly refused instructions requested by the defendant, which were substantially embodied in the charge of the court, or which were objectionable because misstating the law, or as being argumentative or misleading or otherwise subject to just criticism. Where the court gave an elaborate and explicit statement of the law pertinent to the case in all its features, it was not required to add thereto a prolix discussion on the law of homicide because requested.

ID.—REQUESTS AS TO PRESUMED GOOD CHARACTER OF DEFENDANT—ABSENCE OF EVIDENCE.—Where there was no evidence as to the good character of the defendant as to the traits involved in the charge in the information, instructions requested by defendant, declaring that it was the duty of the jury to consider in the determination of the issue the presumption of good character of the accused, were properly refused. The court can neither consider a presumption of good character not proved, as adding weight to the presumption of innocence of the defendant, nor give weight to his assumed bad character, in determining the question whether the evidence establishes his guilt.

ID.—SUPPORT OF VERDICT AND JUDGMENT.—It is held that the evidence is sufficient to support the verdict, and that no ground appears for reversal of the judgment or of the order denying a new trial.

APPEAL from a judgment of the Superior Court of Amador County, and from an order denying a new trial. Fred V. Wood, Judge.

The facts are stated in the opinion of the court.

Spagnoli & Spagnoli, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, Deputy Attorney General, for Respondent.

HART, J.—The defendant and one Giacomo Sampo were jointly charged, by information, by the district attorney of Amador county, with the crime of murder. The court, upon the demand of the defendant, accorded him a trial separately from that of his codefendant. (Pen. Code, sec. 1098.)

The jury found the defendant guilty of the crime of murder of the second degree and so returned a verdict. This appeal is from the judgment and the order denying the defendant a new trial.

The objections urged in this court against the judgment and the order are: 1. Errors in the rulings of the court disallowing challenges interposed by the defendant to certain jurors; 2. Errors in the rulings rejecting and receiving certain evidence; 3. Errors in the refusal by the court to give a number of the one hundred and twenty-seven instructions requested by the defendant; and 4. Insufficiency of the evidence to justify the verdict.

The circumstances leading to and characterizing the homicide are set out with considerable detail in the case of the *People* v. *Sampo* (codefendant of Conte, appellant here), reported *ante*, p. 135, [118 Pac. 957], but, for the purpose of illustrating some of the points made on this appeal, it is deemed proper to briefly repeat them in this opinion.

The homicide occurred at Drytown, in Amador county, on the nineteenth day of November, 1910. Late on the afternoon of that day, the defendants and the deceased, Stefano Pistone, together with a number of others of their countrymen, including George Sampo, brother of the defendant of that name, met at the boarding-house of one Cavallero. The game of "mori" and wine-drinking were indulged in by the parties until supper, after partaking of which they returned to the bar-room, where they resumed playing said game of "mori." Shortly thereafter, however, on suggestion of one of the parties, a dance was started, someone with an accordeon furnishing the music. George Sampo and several others danced with Eva Cavallero, the young daughter of the Cavalleros. Finally, the young lady danced with Pistone, and this act seemed to have been resented by George Sampo, who proceeded, in a loud and angry manner, to use profane language. A general fight followed and Pistone eventually left the room through the back door, going outside the house. In a brief time thereafter, the two defendants departed from the house through the front door. These circumstances took place near the hour of 10 o'clock at night, and at about that hour a Mrs. Calandri, residing with her husband and family a short distance from the boarding-house of the Cavalleros, heard noises which attracted her attention and caused her to step out on to the front porch of her house. From this point she saw, only a few feet from and in front of her house, in the road, the defendant, Sampo, beating Pistone on the head, while the defendant in the case at bar was holding the deceased by the arm. Pistone was loudly exclaiming: "Please let me alone; I have nothing with you; don't hit me; let me alone, please." The defendant Sampo kept on beating the deceased, and the defendant Conte continued to hold him by the arm until one Burdisso finally put in an appearance and forced Sampo to cease beating Pistone, and took the former, accompanied by Conte, back to the boarding-house.

Pistone, assisting himself by holding on to a fence extending from Calandri's house to the boarding-house, went to the last-named place, where he went to bed and died early on the following morning. The physicians, who made an autoptical examination of the body of the deceased, found a serious fracture of the skull, from the effect of which, so they testified, Pistone died.

Early on the following morning, Mrs. Calandri went to the spot where the beating was administered to Pistone and there picked up a rock, large enough in dimensions, as one of the witnesses described it, "to fill a fellow's hand," and upon which she found what she termed "fresh blood stains." She placed the rock on the fence in front of her home, and shortly thereafter it was delivered, in her presence, to the sheriff, who, also in her presence, marked it with a cross for the purpose of its future identification.

This rock was introduced in evidence at the trial and the doctors, testifying for the people, having declared that the wound they found on Pistone's head must have been produced by some blunt instrument, stated that such wound could have been caused by a violent beating on the head with said rock.

1. There are twelve assignments of alleged error involving the rulings of the court disallowing challenges made by the defendant to as many jurors.

We have found in most of these assignments nothing calling for special notice or comment. Nearly all of them involve conflicting statements of the talesmen with regard to their mental attitude toward one accused of a public offense. For illustration, some of the jurors, in reply to questions by counsel for the defendant, declared that they would enter the jury-box with an opinion that the accused was guilty, or that they would throw the burden of proving his innocence upon him, and other similar statements, but, upon being questioned by the district attorney, they invariably replied that they would be governed, in their consideration of the case, by the law as the court presented it to them; that they would presume the defendant innocent until his guilt was proved to their satisfaction, and that they would require the prosecution to bear the burden of establishing his guilt by the proper degree of proof. Under this state of the record

upon the question whether such jurors possessed such bias
as would prevent them from trying the case fairly and im-
partially, it was for the court to determine that preliminary
issue, and in all such cases the court's discretion will not be
disturbed on appeal unless it appears that it has been abused.
We cannot say that the decision of the court in that regard
was erroneous or involved an abuse of discretion. It may
with propriety be observed, in this connection, that, from
common knowledge, it is known that where citizens are for
the first time called to perform jury duty, they generally will
say, until their duty under the law is fully and clearly ex-
plained to them, that they will presume or assume the de-
fendant in a criminal case to be guilty or that they will
entertain a suspicion of his guilt until he shows that he is
innocent, and this is even very often true with citizens who
have had some experience as jurors in criminal cases. And
this fact is not at all surprising, since it is true that those
whose duty it is to serve on juries are, as a rule, laymen,
possessing and pretending to possess no familiarity with rules
of law—even with those rules, so commonly stated to juries,
concerning the presumption of innocence, the burden of
proof, etc. It is, therefore, no matter of wonder or one which
may operate as a true test of a citizen's disqualification to
serve as a juror in a criminal case or of his want of ability
to try such a case with perfect fairness if he may say, in
reply to questions which appear to call for that sort of an
answer, that he will make the defendant prove his innocence
or that he has some suspicion of his guilt from the fact of his
having been held to trial on a criminal charge. As is said
in *People* v. *Ryan,* 152 Cal. 371, [92 Pac. 856]: "Many per-
sons, competent as jurors, have not given much attention to
such subjects, are inexperienced as witnesses, and are unable
readily to comprehend the force and effect of the language in
which such questions are couched, and they generally answer
without reflection as to the effect of their own words. Such
contradictions are by no means infrequent, if, indeed, they
are not the rule, rather than the exception. The trial court
must decide which of the answers most truly shows the juror's
mind. . . . Where there are such contradictions its decision
is binding upon this court," citing a large number of cases.
If, in other words, after the law as to his duty as a juror

has been explained to a citizen called to the panel, he declares that he can and will give both sides a fair and impartial trial; that he is without prejudice for or against the accused; that he is not familiar with the facts of the case except what he might have learned of them through public rumor or from the newspapers, and nothing is otherwise made to appear as to the state of his mind with reference to the case or the parties thereto, and the court believes such statements, then no legal reason can be suggested why he should not remain in the jury-box as against a challenge for implied bias, notwithstanding that he may previously have said,  in answering questions upon his *voir dire,* that he would require the defendant to prove his innocence. In every instance in the case at bar, it may be remarked, the juror declared that he would be governed in his consideration of the case by the law as the court stated it in its instructions, and where the court is convinced from the whole examination that the talesmen will be so guided, if accepted as a juror, although his answers are contradictory, the refusal of a challenge for implied bias interposed to such juror involves only the exercise of a discretion which the law reposes in trial courts in such matters.

Much stress is, however, laid on the action of the court in sustaining an objection to the question propounded by counsel for the defendant to juror Blakeley, whereby counsel sought to show the result of, or the verdicts returned in, several different murder trials in which the juror had theretofore served as a juror. But the ruling disallowing this line of examination was perfectly proper. What an individual, serving as a juror, might do or whatever his course might have been in a particular criminal trial would not constitute a criterion by which his conduct as a juror might be judged in another trial, even where the prosecution involves a similar charge. Where a jury have returned a verdict either of guilty or not guilty in a criminal action, the presumption is that they were influenced in arriving at the result solely by the record as made before them, and it would be plainly violative of every consideration of policy to permit such presumption to be set aside by the prosecution of an inquiry designed to disclose ulterior motives in reaching a verdict in another criminal action in which they have acted as jurors—a result which

would irresistibly follow the acceptance of the conduct of a juror in a particular case as a test determinative of his qualifications to serve as such in some other case involving the prosecution of a like offense.

It is also. vigorously maintained that the court fell into prejudicial error by its ruling disallowing the challenge to juror Allen for implied bias in that he was a client of the district attorney at the time of the trial. The juror stated, in reply to a question by counsel for the defendant, that the district attorney had rendered certain professional services for him and was then asked: "Is he your attorney now?" to which the reply was made: "Well, yes, to be considered so, I guess."

Among the grounds enumerated by section 1074 of the Penal Code upon which a challenge to a juror is authorized to be taken for implied bias are the following: " . . . 2. Standing in the relation of guardian and ward, attorney and client, master and servant, or landlord and tenant, or being a member of the family of the defendant, or of the person alleged to be injured by the offense charged, or on whose complaint the prosecution was instituted, or in his employment on wages."

Even if it may well be conceded that the existence of the relation of attorney and client between the district attorney and the juror comes within the quoted language of section 1074 (a proposition which we need not here decide), it is very plain that the attorney for the defendant in the case at bar failed to make it satisfactorily to appear that the district attorney, *at the time of the trial,* was the regularly retained attorney of the juror challenged on that ground. Even if this be a good ground for challenge under the statute, it will not be claimed that a juror is disqualified from sitting upon a jury in a case in which one of the attorneys has at some previous time acted as his attorney or transacted legal business for him, if, at the time of the trial, the relation of attorney and client does not exist between the attorney and the juror. The true rule would be that, in order to make that an available ground of challenge for implied bias, the attorney and the juror must stand in the relation of attorney and client *at the time of the trial,* and if that relation does not then exist, the juror could not be successfully challenged for that reason, although it

may appear that the attorney upon some previous occasion had performed professional services for the juror.

It is difficult to say, from the answer given by the juror in the present case, whether, in point of fact, the relation of attorney and client subsisted between him and the district attorney at the time of the trial. That the district attorney had at some previous time acted for the juror in a professional capacity is not proof of the existence of that relation between them at the time of this trial. The last answer of the juror is fairly and reasonably capable of either of two constructions, viz.: 1. That the district attorney was then acting as his attorney in some existing litigation or other uncompleted legal matters; 2. That the juror thus merely intended to say that, having employed the district attorney as his legal adviser on one occasion, he would again retain that officer should he find it necessary on any future occasion to employ the services of a lawyer. Thus, it will be observed, as we have stated, the answer of the juror leaves the question whether the district attorney and the juror bore the relation of attorney and client at the time of the present trial in so much doubt that we cannot say what the fact really was. As the burden rested on the defendant to clearly and satisfactorily show the juror's disqualification for the reason constituting the basis of his challenge, assuming that that reason constituted a legal ground for challenge, and having failed to make such a showing, we cannot declare that the court's ruling in disallowing the challenge was improper. If, as a matter of fact, the district attorney was, at the time of this trial, the regularly retained legal adviser of the juror, counsel for defendant could without difficulty have developed the fact to a conclusive degree by pressing the inquiry further; but, in lieu of thus proceeding, they appear to have been satisfied to rest their challenge on the manifestly vague and indefinite "guess" of the juror in that regard. The state of the record upon this point, as before indicated, is such that we cannot declare the ruling erroneous, conceding that the statute authorizes a challenge on that ground.

2. Many of the rulings of the court upon the evidence objected to here involve precisely the same points reviewed by this court in the case of the *People* v. *Sampo*, codefendant of

the defendant in the case at bar, reported *ante,* p. 135, [118 Pac. 957], and decided adversely to the contentions here. There is no substantial difference between the evidence in the Sampo case and that in the one at bar, and it will, therefore, be unnecessary to again go over with any particularity the field of inquiry covered by said points. They may, however, be restated here: That the court erred in allowing Mrs. Calandri to testify that, on the morning following the night on which Pistone was assaulted, she found and picked up at the spot where the assault occurred a large rock on which there were fresh blood stains; that it was error to receive said rock in evidence as an exhibit or a circumstance in the case; that it was improper to permit the doctors to testify that the wound found upon the head of the deceased must have been produced by the use of some blunt instrument, and that said wound could have been produced by means of the rock referred to, etc.

But a further objection against the testimony of Mrs. Calandri and her husband describing what they saw and heard at the time the defendants were beating Pistone is urged on the ground that such testimony did not constitute a part of the *res gestae.* Like objection is made to the testimony of Eva Cavallero detailing the movements of the defendants after the trouble in the house had ceased and Pistone had taken his departure from said house through the back door.

These objections are clearly destitute of merit. The departure of Pistone from the boarding-house, followed immediately by the circumstance of the departure of the defendants through the front door, constituted pertinent and, indeed, necessary circumstances tending to connect the defendants with the commission of the assault. They were not admissible facts upon the theory that they constituted a part of the *res gestae,* as that rule is technically understood, but as relevantly showing that the assault could have occurred where it was shown to have taken place and that the defendants could have committed it. It would, indeed, be a curious rule of evidence that would preclude the state in such a case from showing that the accused left the place where the crime was not committed, or, in other words, from proving that the accused were in a position of opportunity to commit the act.

Nor, as counsel seem to argue, was it necessary as a foundation for such proof, for the district attorney to show that, preliminarily to the departure of the defendants from Cavallero's the accused had actually entered into an understanding or conspiracy to commit an assault upon Pistone. If it were necessary to make any more potent proof of an agreement or understanding between the defendants to commit the assault than the very fact itself that they jointly committed it, the circumstance of their departure together from the boarding-house immediately following the departure therefrom of Pistone would constitute a significant and pertinent link in the chain of circumstances leading to the establishment of a conspiracy.

What we have said in the foregoing applies with equal force to other parts of the testimony of Eva Cavallero. She merely described the occurrences in the boarding-house immediately preceding the circumstances of the departure of Pistone and of the defendants from the house, and these all constituted important circumstances finally culminating in the homicide.

It is further claimed that the testimony of the witness, Burdisso, who saw the defendant Sampo beating Pistone with a rock, while the defendant, Conte, held the arm of the deceased, and whose testimony consisted solely of what he then saw, was improperly received, as "it was no part of the *res gestae.*" The force of this objection passes our comprehension. We are unable to discern how testimony bearing directly upon the very act which constitutes the basis of the crime for which an accused is tried is not about the most significant and pertinent proof that can be adduced in support of the charge. It is true that direct testimony is not admissible merely under the technical rule of *res gestae,* strictly speaking, for, under that salutary doctrine, certain testimony and declarations tending to explain the nature of the act or intent or both of a criminal charge are admissible which would, ordinarily, be regarded as involving hearsay testimony or self-serving declarations, yet, accepting the term, *res gestae* (the transaction itself), in its true sense, we would be at a loss to understand the bearing or significance of direct testimony if it could be said in any case not to be of and concerning the *res gestae* itself, or the very transaction which

in and of itself constitutes the basis of the crime with which the accused is charged.

The further contention is urged that the court seriously erred in permitting the district attorney, in his opening statement, to explain to the jury the elements of the crime of murder. The prosecuting officer's definition of the crime with which the information charges the defendant was in accord with our code definition of murder and was, therefore, correct. While it is not the duty or the right of attorneys to state the law to the jury in criminal cases, a defendant in such a case cannot justly be said to have suffered any prejudice where that rule has been violated but where the law has not thus been misstated. Besides, in the case at bar, the court, upon the conclusion of the district attorney's opening statement, emphatically warned and instructed the jury that they should not accept the law of the case from counsel, but that it was their duty to be guided solely by the law as it was stated to them by the court. The defendant was not damaged by the conduct of the district attorney in the respect complained of.

Appellant also insists that the court prejudiced his rights very seriously by its ruling with regard to the proffered testimony of Dr. Endicott, in rebuttal of the statement of Mrs. Calandri, that the surface of the rock she found at the scene of the assault bore blood stains. It appears that counsel for the defendant called the doctor to the witness-stand and asked him to examine the rock and say, by a mere inspection and without a microscopical examination or other scientific analysis of the spots on said rock, whether there were blood stains thereon. The doctor refused to testify as an expert unless he was guaranteed the usual fee for such services, and counsel for the defendant requested the court to make an order for the payment of such fee out of the county treasury, declaring that his client was without the means to defray that expense. This the court refused to do. After considerable colloquy between court and counsel, the latter was ordered by the court to put the questions to the witness that he desired to ask, but counsel seemed to insist that some arrangement be first made for the payment of the doctor for his services as an expert witness, and that thereupon the latter be given possession of the rock for the purpose of making such an

examination thereof as would enable him to determine and say whether the marks which Mrs. Calandri declared were blood stains were or were not caused by human blood. The court denied this request. We think the court's action in this matter cannot be made the predicate of prejudicial error.

At the trial of the defendant, Mrs. Calandri testified that the marks which she took for blood stains had undergone such a change in appearance that she could not then say that they were the result of blood stains, and it is highly probable that, under such circumstances, Dr. Endicott could not have determined, any more than could a lay witness, in the absence of an appropriate chemical analysis of the marks, whether they were caused by blood or produced by some other cause. And we are familiar with no law requiring the court under such circumstances to order the services of an expert witness in behalf of a defendant to be compensated for out of the public funds. We have no doubt that the doctor, having been sworn as a witness, could have been required to answer such pertinent questions as might have been put to him, notwithstanding that they might call for expert testimony and the doctor not recompensed or guaranteed compensation for his services as an expert, but we know of no rule of law which would have authorized the court to compel him to go to the trouble and perhaps some expense of scientifically investigating the cause of the marks on the rock for the purpose of qualifying himself to give expert testimony on that subject.

But the problem which, on first impression, appeared to be the most serious one of those respecting rulings on the evidence is involved in the refusal of the court to permit the defendant to prove by the witness Ferrari that the defendants and their companions had drunk enough wine prior to the assault to put them in a state of intoxication.

In their opening statement, counsel for defendant declared that they could and would show that the defendant was not at the scene of the assault when it was committed. Their sole contention in behalf of the defendant would, in other words, be an *alibi*. The district attorney strenuously objected to any testimony relative to the amount of wine drunk by Conte and the other parties during the several hours immediately preceding that at which Pistone was assaulted, upon the theory, as announced by him, that, having declared that he intended

to rely upon an *alibi*, the defendant could not set up a defense inconsistent with that contention. The court insisted upon counsel for the defendant making a statement as to the purpose of the testimony. Counsel declared that they had no intention of receding from their claim of an *alibi* for the defendant, but that they thought they were entitled to introduce proof having a tendency to reduce the crime to the grade of manslaughter in the event that the jury should regard the proof addressed to the *alibi* unworthy of belief. But, finally, counsel declared to the court that the proffered testimony bearing upon the quantity of wine which the parties had consumed and the condition produced thereby was intended as a support to the *alibi* contended for by the defendant. The court thereupon sustained the district attorney's objection to the testimony.

We are unable to perceive how this testimony could have thrown any light on the claim of an *alibi* in this case, and if that was the sole purpose of the testimony, we can see nothing harmful in the ruling disallowing it. It may be that the intoxicated condition of one accused of crime might, under some circumstances, be a circumstance in support of an *alibi*, but the circumstances of this case will not sustain the propriety of any such theory. But we may remark that had counsel adhered to the theory upon which they first offered the testimony—that is, to mitigate the grade of the crime in case the jury rejected the evidence addressed to the proof of the *alibi*—the court's ruling would undoubtedly have been erroneous, since it is well settled, we think, that inconsistent defenses or claims may be interposed in a criminal case as well as in a civil action, if counsel or the defendant may choose to take that course. But, in any event, the ruling could not, in our opinion, be held to be prejudicial, if erroneous, in view of the evidence and the nature of the circumstances by which the assault was committed. (Const., art. VI, sec. 4½.) It could not be held, in other words, that the ruling, if erroneous, had resulted in a miscarriage of justice. The evidence appears to disclose not only a deliberate, but a very cruel, murder. The jury would have been well justified in finding that Conte and Giacomo Sampo followed the deceased from the boarding-house with the express design

of assaulting and perhaps of killing him, and, as was said in *People* v. *Sampo, ante,* p. 135, [118 Pac. 957], the defendant here may well consider himself extremely fortunate in having escaped the highest penalty prescribed for the willful and malicious destruction of human life. There is evidence in the record that all the parties, including the defendant, drank more or less wine during the early after-noon of the day of the homicide, but there is nothing to show that the defendants were at any time in such mental condition by reason of their indulgence in wine as to render them irresponsible or unable to know the difference between right and wrong or that they were thus deprived of ability to form an intent to commit an assault upon or murder Pistone. Indeed, both the defendant and his codefendant seemed to experience no difficulty in detailing on the witness-stand, in support of their claim that they were not at the scene of the assault when it was committed, every movement that they made that day and night. It is, therefore, most probable that the testimony of Ferrari as to the defendant's condition for sobriety, or inebriety, if offered for that purpose, would not have had the effect of reducing the verdict to a lesser grade of crime than that of which he was convicted.

There are some other rulings to which exceptions are taken by the defendant which demand no special notice.

3. The defendant assigns a large number of errors in the action of the court in declining to allow and read to the jury certain instructions proposed by him. In addition to its own charge, which covers every possible phase of the case as made by the information and the evidence, the court allowed and submitted to the jury, in the precise form of language in which they were proposed, forty-four out of the one hundred and twenty-seven special instructions requested by the defendant, and, besides, gave, in modified form, four of the remaining number. Many of the instructions requested by defendant and not given involved the statement of principles which the court covered in its charge, and the others were objectionable either because they misstated the law or were argumentative or misleading or for other reasons obnoxious to just criticism. But we cannot conceive how the court could have submitted to the jury a more elaborate and explicit statement of the law pertinent to the case in all its features than

its charge represents without converting the office of instructions to a jury into a prolix disquisition on the law of homicide.

Counsel, however, particularly criticise the court's refusal to give the instructions, requested by defendant, declaring that it was the duty of the jury to consider, in the determination of the issue, the presumption of the good character of the accused. There was no evidence submitted as to the good character of the defendant for the traits involved in the charge in the information, and the instructions requested on that subject were, therefore, properly refused. (*People* v. *Johnson,* 61 Cal. 142; *People* v. *Lee,* 1 Cal. App. 169, [81 Pac. 969] ; *Danner* v. *State,* 54 Ala. 127, [25 Am. Rep. 662].)

The court instructed the jury that the defendant was to be presumed to be innocent until the reverse was satisfactorily proved, and, as is said in *People* v. *Johnson,* 61 Cal. 142, where a similar instruction as those refused here was rejected, no affirmative proof of the defendant's good character having been made, "the consideration of his character would not add to the strength of the presumption of innocence." In the same case, in a concurring opinion, Justice McKinstry said: "If in the absence of evidence on the subject, the presumption of good character is to weigh as much in his favor as affirmative proof of it, the necessity of proving good character would never arise; and the prosecution would frequently be in a worse case than if evidence of good character had been given—since the prosecution would be debarred from introducing evidence to overcome the *presumption.* When it is said that good character is to be presumed it is only said that, in the absence of evidence, the jury should not attribute to defendant a general bad character with respect to the qualities involved in the alleged offense, nor give weight to his assumed bad character in determining the question whether the evidence established his guilt."

4. We have already sufficiently referred to the evidence to indicate that we do not assent to the contention that the evidence does not support or justify the verdict.

The testimony of Mrs. Calandri and Burdisso that the defendant was holding the deceased while Sampo was beating him was, if believable (and the jury did believe it), sufficient

to establish Conte's connection with and participation in the commission of the crime.

We have, after a full examination of the record, discovered no substantial reason for disturbing the conclusion of the jury.

The judgment and order are, therefore, affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 2, 1912, and the following opinion then rendered thereon:

THE COURT.—The application for a hearing in this court after decision by the district court of appeal is denied. In denying such application, it is proper to say that we are not satisfied with what is said in the opinion on the question presented by the ruling disallowing the challenge of defendant to the juror Allen, or with what is said relative to the exclusion by the trial court of the proposed evidence of the witness Ferrari on the subject of the voluntary intoxication of the defendant.

1. In the matter of the challenge of juror Allen, the proper answer to defendant's claim is that the existence of the relation of attorney and client between the district attorney and a juror is not a ground of challenge under our statute. Subdivision 2 of section 1074, Penal Code, upon which the challenge was based, does not include such a case. The relationship there referred to is one existing between the juror and the defendant himself or "the person alleged to be injured by the offense charged, or on whose complaint the prosecution was instituted." This was the reason given by the trial court for its ruling.

2. In the matter of the proposed evidence as to voluntary intoxication: The evidence was clearly admissible and its exclusion was error. But the utmost effect of evidence of this nature would have been to exclude the idea of the deliberation and premeditation essential to murder of the first degree, and thus reduce the offense to murder of the second degree. The defendant was found guilty of murder of the second degree only, doubtless because of the evidence of other witnesses

tending to show a condition of intoxication. Plainly no preju-
dice was suffered by defendant by reason of the erroneous
ruling.