[Crim. No. 299. Second Appellate District.—December 17, 1913.]

THE PEOPLE, Respondent, v. WILLIAM WILSON, Appellant.

CRIMINAL LAW—HOMICIDE—ADMISSIBILITY IN EVIDENCE OF PIECES OF BUGGY SHAFT.—In a prosecution for murder, where the evidence is purely circumstantial, pieces of a buggy shaft, found on the premises where the crime was committed, are admissible in evidence, there being evidence tending to show that the fatal blow received by the deceased was administered by the use of the shaft.

ID.—FOREMAN OF CORONER'S JURY AS WITNESS—CROSS-EXAMINATION—INTRODUCTION OF CORONER'S VERDICT.—In such prosecution it is proper, on the cross-examination of the prosecuting witness, who was

23 Cal. App.—33

foreman of the coroner's jury, to refuse to admit in evidence the verdict of such jury certifying that they did not know who killed the deceased.

Id.—Evidence of Prior Acts of Violence—Refusal to Strike Out— Nonprejudicial Error.—When in such prosecution evidence is admitted of violence suffered by the deceased on a certain occasion, but the defendant is not shown to have been connected therewith, it is error to refuse to strike out such evidence; but the error is not to be regarded as prejudicial on appeal, when the record contains other evidence of actual violence on other occasions on the part of the defendant toward the deceased.

Id.—Evidence—Previous Hostility and Violence—Remoteness in Time.—Testimony in a homicide case that the defendant has at different times within a year or two before the death of the decedent quarreled with and expressed hostility toward the deceased is admissible as tending in some degree to show malice and motive with reference to the offense charged. The objection as to the remoteness of the occurrences goes to the weight rather than to the admissibility of the evidence.

Id.—Threats Against and Assaults upon Deceased—Evidence— Instructions.—An instruction that "evidence has been introduced as to altercations with, threats against and assaults upon the deceased by the defendant. This evidence has been admitted for the sole purpose of showing the relations existing between the deceased and the defendant, and for the purpose of showing motive, if any; and may be considered by you as a circumstance in connection with the other facts and circumstances in the case in determining whether or not the defendant is guilty of the crime charged,"—is not objectionable, (although it might have been phrased more carefully), as telling the jury that those altercations, assaults, and threats actually occurred.

Id.—Circumstantial Evidence—Sufficiency to Sustain Conviction —Argumentative Instructions.—An instruction in a homicide case, where the evidence is purely circumstantial, that "counsel for defendant has referred to a number of cases wherein convictions have been sought and had upon strong circumstances of guilt proved against the accused in those cases, and afterward it has transpired that the accused was innocent, notwithstanding the strong circumstances shown against him. These cases are extreme cases, and probably do not occur but seldom in cases decided upon circumstantial evidence. Reference to such cases is proper in order to make the jury careful in arriving at the proper conclusion from such evidence; but the plain, practical rules of evidence which have been established for ages ought not to be shaken because of the reference to extreme cases by counsel wherein improper convictions have been had—and if much search be made, it would be

found that probably a greater number of cases might be cited wherein improper convictions have been had from direct and positive evidence through inattention or perjury of witnesses. All human testimony is fallible. But jurors in their decision must take and consider circumstances and if sufficient act upon them, although the main fact is proved by no eye-witness," is argumentative and should not be given.

ID.—PROOF OF MOTIVE—INSTRUCTION SIMILAR TO ONE REQUESTED BY DEFENDANT.—Where the defendant in a homicide case has requested an instruction that "it is not indispensable to a conviction of the defendant that a motive be shown for his commission of the crime," he cannot complain of an instruction given by the court that "in criminal cases the proof of the moving cause is permissible and oftentimes valuable, but is never essential." The defendant cannot complain of instructions which are in substance the same as those requested by him.

ID.—EVIDENCE OF GOOD CHARACTER OF DEFENDANT—REFUSAL OF INSTRUCTIONS CONCERNING.—Where the defendant in a homicide case has introduced in evidence the testimony of several witnesses who have been acquainted with him for many years, showing his good reputation "for peace and quietude and truth and veracity" in the communities where he has lived, and has requested the court to give the jury certain instructions pertinent to this evidence, the refusal of the court to give such instructions must, under the circumstances of this case, be regarded as prejudicial error resulting in a miscarriage of justice and calling for a reversal of the judgment of conviction.

ID.—EFFECT OF PROOF OF GOOD CHARACTER—NECESSITY OF JURY GIVING IT CONSIDERATION.—Proof of good character comes in aid of the general presumption of innocence, and is no more to be laid out of view by the jury in their deliberations than is the original presumption itself; it is itself a fact in the case.

ID.—APPEAL—"MISCARRIAGE OF JUSTICE"—MEANING OF PHRASE.— The phrase "miscarriage of justice," within the meaning of section 4½ of article VI of the constitution, does not simply mean that a guilty man has escaped, or that an innocent man has been convicted. It is equally applicable to cases where the acquittal or the conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied. The right of the accused in a given case to a fair trial, conducted substantially according to law, is at the same time the right of all inhabitants of the country to protection against procedure which might at some time illegally deprive them of life or liberty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected.

APPEAL from a judgment of the Superior Court of Santa Barbara County and from an order refusing a new trial. S. E. Crow, Judge.

The facts are stated in the opinion of the court.

B. F. Thomas, and A. B. Bigler, for Appellant.

U. S. Webb, Attorney-General, and George Beebe, Deputy Attorney-General, for Respondent.

CONREY, P. J.—The defendant having been convicted of the crime of manslaughter, appeals from the judgment and from an order denying his motion for a new trial.

The information in this case charged the defendant with the crime of murder committed on the twenty-second day of October, 1912, in the killing of one Thomas Wilson. The defendant and the deceased were brothers, aged respectively about fifty-four and sixty years. In October, 1912, and for about one year prior thereto, they had been living together on a ranch known as the Hopkins place, located nearly two miles southeast of the town of Orcutt in the county of Santa Barbara. During October, 1912, these two were the only occupants of the ranch and of the house thereon where they were living. In the afternoon of October twenty-first they went together to Orcutt, and after attending to some business there, they drove back to the ranch. On the morning of October 22nd, between eight and nine o'clock, the defendant came to Orcutt and gave information that his brother was dead, and asked the justice of the peace, who was also acting coroner, to come to the ranch. The defendant then returned to the ranch, being immediately followed by the acting coroner and several other men, most of whom were summoned as members of a coroner's jury. The evidence upon which the defendant has been convicted is entirely of a circumstantial nature, and consists largely of testimony of these men who visited the ranch on that morning as to the facts which they discovered on inspection of the premises at the Hopkins place.

There was a front porch of the Hopkins house, with a door opening into a middle front room, known as the sitting room, and in which there was a fireplace. On the right side of the

sitting room as one enters through the front door there was a door opening into defendant's bedroom. Immediately opposite this on the other side of the sitting room was a door opening into the bedroom of Thomas Wilson. These witnesses found Thomas Wilson lying on his back on the front porch, with a pillow under his head, his right arm extended by the side, and his left arm across the breast. The right arm was broken at the elbow and the third finger of the left hand was mashed as by some severe blow. Two cuts made by the blows of some blunt instrument had laid open the scalp on top of the head; and the evidence shows that one or both of these blows was the cause of death. There was a considerable amount of blood on the pillow and on the floor near the head and along the side where the arm lay. The testimony shows that blood was found in the sitting room on the casing of the door leading into the deceased's bedroom, and on the wall of the sitting room on each side of that door, and on the floor between the deceased's bedroom door and the front door and on the inner knob of the front door. Some effort had been made to wash the floor immediately in front of the deceased's bedroom door. From that place to the front door the blood was only in isolated drops, except that at one place in the sitting room and near the front door the blood marks approximated the shape that would be left by the pressure of a bloody hand.

Some of the witnesses found floating in the well near the barn a piece of an old buggy shaft. Some of the witnesses found behind a box on the front porch near the body of deceased a sliver of wood, which fitted into a recently broken place on the piece of buggy shaft found in the well. They also found in the ashes of the fire place a broken end of a buggy shaft, but this was not shown to fit into or be a part of the piece of buggy shaft found in the well. There is some evidence of human blood stains upon the sliver of wood found on the porch and upon the piece of buggy shaft found in the well. There is no evidence showing where these pieces of buggy shaft came from, nor that they were ever seen on the Hopkins place before the 22nd day of October, 1912, nor that any person ever saw them in the possession of the defendant. One witness also stated, with respect to the piece taken from

the fire place, "I think it had blood spots on it, or what was apparently blood spots."

Defendant testified that when he returned with the deceased to the Hopkins place on the evening of October 21st the defendant unhitched the team and the deceased went up to the house; that when the defendant came up to the house his brother was lying on his (the deceased's) bed; that at about seven o'clock the defendant went to bed and read a newspaper until nearly ten o'clock, at which time he heard his brother go out; that the defendant went to sleep without hearing his brother return to the house; and the defendant then slept until six o'clock in the morning; that at about six o'clock in the morning the defendant, after making some preparations for breakfast, looked into his brother's room and then looked out through the window and saw him lying on the porch; that he went out and found that his brother was dead, and thereupon he put the left arm up over the breast, went into the house and got a pillow which he brought out and placed under his brother's head; that he then went to his brother's bed and obtained a bedspread with which he covered the body, as it was found by the men who came later; that he then hitched up the team, drove to a neighbor's, where he reported his brother's death, and then went to Orcutt, where he reported the fact of his brother's death.

There is testimony by several witnesses relating to a number of occasions when quarrels are said to have occurred between defendant and Thomas Wilson. These occurrences are placed at various times extending from two weeks to two years prior to October 22, 1912. For the most part they are isolated instances supported separately by single witnesses and denied in whole or in part by the defendant.

There are many assignments of error set forth in the briefs of defendant's counsel. After eliminating those which are of slight importance or not justified by the record, the following items appear to require more particular discussion or statement of the opinion of this court.

The court did not err in admitting in evidence the pieces of buggy shaft. It was necessary for the prosecution to show as accurately as possible the means by which and manner in which Thomas Wilson came to his death. The facts with respect to those pieces of wood having been shown as herein-

above stated, their presence upon those premises at the places where they were found and under the circumstancs then existing, had a direct tendency to show that the blows received by Thomas Wilson had been administered by the use of said buggy shaft. In *People* v. *Hill,* 123 Cal. 571, [56 Pac. 443], it was held to have been error for the court to permit to be received in evidence and exhibited to the jury a club found in the corral where the defendant and the deceased had the encounter in which the murder was alleged to have been committed. There was in that case no evidence tending to show that the stick was the one with which the deceased had been hit, or that the defendant was connected with it in any manner. The presence of blood marks or other signs connecting it with said encounter would have made the exhibit admissible in evidence. In *People* v. *Sampo,* 17 Cal. App. 149, [118 Pac. 957], referring to the admission in evidence of a rock found at the place where the defendant had administered a beating to the deceased, the court held that such evidence was properly admitted, not only because there was testimony that the defendant had used a rock in attacking the deceased, but also because this rock was admissible in evidence for the following reasons: "Moreover, the doctors testified that the wound inflicted upon Pistone's head appeared to have been produced by some blunt instrument, and that it could have been caused by the use of the rock in question. Having been found at the very place where the beating occurred, with fresh blood stains thereon, and in view of the testimony of the physicians that the wound could have been made by means thereof, the rock itself constituted a pertinent circumstance to be considered with the other evidence in determining the question of the guilt of the accused."

On cross-examination of the witness James H. Drumm, it having been made to appear that this witness had been foreman of the coroner's jury, and also that he was the complaining witness on whose sworn statement this prosecution was instituted, the defendant offered in evidence the verdict of the coroner's jury. Upon objection that this was irrelevant and immaterial, the court sustained the objection and refused to allow defendant's counsel to state the purpose of the offer. It is now stated that the object was to show that the witness had made contradictory statements in that on the twenty-

second day of October he joined in a verdict of the coroner's jury stating that they did not know by whose hands Thomas Wilson come to his death, and that on the following day, without further evidence, he filed the complaint charging the defendant with murder. Immediately preceding the offer in evidence of said verdict, defendant's counsel asked the witness: "What discovery of evidence of any sort in regard to defendant's guilt in this case did you make between the time you signed the verdict of the coroner's jury up to the time you filed the complaint?" This was objected to as irrelevant, immaterial, and not cross-examination and the objection was sustained. We find no error in these rulings. Assuming that the witness had joined in a verdict of the coroner's jury and thereby certified to the fact that he did not know who killed Thomas Wilson, that was not inconsistent with his right and duty as a witness to state in testimony any facts known to him and relative to the issues of this case, and was not in conflict with any testimony so given by him.

The witness C. R. Drumm had been employed by the defendant in December, 1911, and January, 1912, at the Hopkins place. After relating an incident in which he stated that the defendant struck Thomas Wilson in the face, this witness referred to another occasion during his said period of employment, as follows: "I had been in the dining room eating my supper and I got through with my supper and went into the sitting room and was sitting there in the sitting room. I heard a fall and immediately afterwards Billy came into the room and says, 'Tom fell down and I picked him up,' and the next morning, why, both of Tom's eyes were shut." The defendant moved to strike out this answer as not connecting the defendant with any blows or bruises upon Thomas Wilson's face, and the motion was denied. We think this ruling was erroneous. For the reason stated in the motion, the answer should have been stricken out. This, however, cannot be seriously prejudicial to the defendant, since the record contains other evidence of actual violence on the part of defendant toward said Thomas Wilson.

In October, 1911, for a short period of time, Thomas Wilson left the defendant and lived at the house of one F. J. Beson. Mr. Beson having testified to this fact was asked whether, during the time that Thomas Wilson was living at his place,

the witness had ever heard a conversation between Thomas Wilson and the defendant. Defendant's counsel objected to this evidence as too remote from the time of the alleged murder, and the objection was overruled. The witness then testified that the defendant asked Thomas Wilson if he was coming back to him and that Thomas replied: "It's no use; we cannot get along, and I am not coming back." Immediately following this testimony the witness, referring to a prior occasion when Thomas Wilson's eyes were black and his face scratched up, repeated a conversation in which the witness asked the defendant what was the matter with Tom's face and the defendant said: "I slapped him over and knocked him over the other day. It is no credit to a brother to hit another one, but he makes me so mad sometimes that I can't help it." The admission of this and some similar testimony is claimed to have been erroneous because of the remoteness of the incidents from the time of the alleged murder. We think, however, that where, as in this case, a series of incidents are shown, beginning a year or two prior to the date of the offense charged and recurring at intervals down to a time near said date, the objection on account of remoteness of the earlier incidents cannot be sustained. These incidents taken together (to the extent that they were proved by the evidence) constitute the best available evidence of the actually existing relations between the defendant and the deceased while they were so living together, and thus tend to show the existence of malice or a motive for further violence on the part of the defendant. In a case of this kind, testimony that the defendant has on previous occasions quarreled with and expressed hostility toward another is admissible as tending in some degree to show malice and motive with reference to the offense charged. The objection that the occurrence was too remote goes to the weight rather than to the admissibility of the evidence. (*People* v. *Piercy,* 16 Cal. App. 13, [116 Pac. 322]; *People* v. *Chaves,* 122 Cal. 134, 143, [54 Pac. 596].)

The seventh instruction given the court is as follows: "Evidence has been introduced as to altercations with, threats against and assaults upon the deceased by the defendant. This evidence has been admitted for the sole purpose of showing the relations existing between the deceased and the defend-

ant, and for the purpose of showing motive, if any; and may be considered by you as a circumstance in connection with the other facts and circumstances in the case in determining whether or not the defendant is guilty of the crime charged.'' It is objected to the foregoing instruction that it practically tells the jury that those altercations, assaults, and threats actually occurred. Undoubtedly it is the policy of our law, emphatically stated in the constitution of the state, that judges shall not charge juries with respect to matters of fact; but it is also declared that they may state the testimony and declare the law. (Const., art. VI, sec. 19.) While the foregoing instruction might have been phrased more carefully, so as to make it clearer that the court was not instructing upon the weight or effect of evidence, yet we cannot say that the instruction as given constitutes a declaration by the court with respect to matters of fact, or that it interferes with the full right and power of the jury to find the facts involved in the matters to which said evidence refers.

It is further objected that in giving instruction 17 the court violated said provision of the constitution by charging the jury with respect to matters of fact. Instruction 17 reads as follows: ''Counsel for defendant has referred to a number of cases wherein convictions have been sought and had upon strong circumstances of guilt proved against the accused in those cases, and afterward it has transpired that the accused was innocent, notwithstanding the strong circumstances shown against him. These cases are extreme cases, and probably do not occur but seldom in cases decided upon circumstantial evidence. Reference to such cases is proper in order to make the jury careful in arriving at the proper conclusion from such evidence; but the plain, practical rules of evidence which have been established for ages ought not to be shaken because of the reference to extreme cases by counsel wherein improper convictions have been had—and if much search be made, it would be found that probably a greater number of cases might be cited wherein improper convictions have been had from direct and positive evidence through inattention or perjury of witnesses. All human testimony is fallible. But jurors in their decision must take and consider circumstances and if sufficient act upon them, although the main fact is proved by no eye-witness.''

It is true that this instruction involves a statement of matters of fact, but, whether correctly stated or not, it related to matters of history and general information, rather than to facts contained in the trial record of this case. For this reason it may be that the instruction does not violate the above-mentioned provision of the constitution, but it is argumentative and, in our opinion, should have been omitted from the instructions given. It did not add anything to the law of the case as stated by the court in its other instructions.

Defendant claims that it was error for the court to state in its 18th instruction that, "in criminal cases the proof of the moving cause is permissible and oftentimes valuable, but is never essential." In No. 21 of the instructions requested by defendant we find a declaration that "it is not indispensable to a conviction of the defendant that a motive be shown for his commission of the crime." The defendant thus having offered this proposition as a part of the instructions requested by him, he is not in a position to claim the benefit of an objection thereto. "The defendant cannot complain of an instruction which is in substance the same as those requested by him." (*People* v. *Harlan,* 133 Cal. 16, 23, [65 Pac. 9].)

The instructions stating the law as to what constitutes manslaughter were properly given. (*People* v. *Cramley, ante,* p. 340, [128 Pac. 123].)

The defendant introduced in evidence the testimony of several witnesses who had been acquainted with him for many years, showing the defendant's good reputation "for peace and quietude and truth and veracity" in the communities where he has lived. The defendant having requested the court to give the jury certain instructions pertinent to this evidence, the court refused to give any of them and failed to give to the jury any instructions whatever on the subject of good character of the accused. The court should have given these instructions, or so much of them as was necessary to state the law with reference to the evidence of good character and the extent to which such evidence, and the facts shown thereby, may be considered as bearing on the question of the guilt or innocence of the defendant. Proof of good character, when shown by the evidence, comes in aid of the general presumption of innocence, and is no more to be laid out of

view by the jury in their deliberations than is the original presumption itself. The good character of the prisoner, when proven, is itself a fact in the case. It is a circumstance tending in a greater or less degree to establish his innocence, and cannot be put aside by the jury in order to ascertain if the other facts and circumstances considered by themselves do not establish his guilt beyond a reasonable doubt. (*People* v. *Raina,* 45 Cal. 292.) This ruling has been affirmed and further discussed in *People* v. *Shepardson,* 49 Cal. 629, and *People* v. *French,* 137 Cal. 218, [69 Pac. 1063].)

Having determined that the defendant was entitled to have instructions given with reference to the evidence of his previous good character, and the court having refused to give any such instructions, we are of the opinion that this failure constitutes error of such importance to the defendant's rights that we must carefully consider whether it has caused a miscarriage of justice within the meaning of section 4½ of article VI of the constitution of the state. Under such circumstances we are required to examine the entire cause, including the evidence, and thereby to determine whether the error complained of has "resulted in a miscarriage of justice." The phrase, "miscarriage of justice," does not simply mean that a guilty man has escaped, or that an innocent man has been convicted. It is equally applicable to cases where the acquittal or the conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied. The right of the accused in a given case to a fair trial, conducted substantially according to law, is at the same time the right of all inhabitants of the country to protection against procedure which might at some time illegally deprive them of life or liberty. "It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected." (Opinion written by Mr. Justice Sloss in *People* v. *O'Bryan,* 165 Cal. 55, [130 Pac. 1042].) In the case last cited the same writer said: "We are not to determine, as an original inquiry, the question of the defendant's guilt or innocence. But, where the jury has found him guilty, we must, upon a review of the entire record, decide whether, in our judgment, any error committed has led to the verdict which

was reached. If it appears to our satisfaction that the result was just, and that it would have been reached if the error had not been committed, a new trial is not to be ordered.''

The concrete question now presented in the present case is, was the conviction of this defendant just, and would that result have been reached if the court had given the defendant the benefit of appropriate instructions concerning the evidence of defendant's good character and concerning the duty of the jury to consider the same? A summary of the principal facts shown by the evidence is given at the commencement of this opinion. We have carefully examined the testimony as set forth in the reporter's transcript. We must take into view the fact that the evidence of defendant's guilt is wholly of a circumstantial nature, and that it was possible for some third person to have killed Thomas Wilson while the defendant slept. We must remember that there were some circumstances in the conduct of the defendant which might reasonably be construed as that of an innocent man; such as, for instance, that he promptly reported the fact of his brother's death, freely (we cannot say whether truly or not), answered all questions put to him concerning his brother's death; and made no effort to escape. And the record here shows that in two trials of this case the juries could not agree upon a verdict. Why did the third jury find the defendant guilty? Was the evidence of the state more convincing? Or were these last jurors more intelligent or more faithful to their duty? These questions we cannot answer since we have here the record of only the last trial. On the other hand, there are facts which limit the importance of the refused instructions with reference to the evidence of defendant's good character as a peaceable man. Of what avail is it that one's general conduct is peaceable and friendly, if he harbors malice against some one person? Here several of the witnesses recounted instances when, according to their testimony, the defendant raised his hand against his brother, and the circumstances shown in evidence indicate not only that Thomas Wilson was killed at the house on the Hopkins place, but also that some important part of the violent encounter took place in the sitting room next to the room where the defendant claims to have been asleep.

It is not for us to say whether we think that the defendant is guilty, and nothing said here is to be taken as indicating any opinion on the question of his actual guilt. We do hold that if the jury had been instructed upon the law concerning their duty to consider the evidence of defendant's previous good character as a part of the evidence upon which they were to determine the question of his guilt or innocence, such instruction would have added a substantial item to the balance in defendant's favor and might have changed the verdict. This being so, the case is one where the right of defendant to such instruction was a right the loss of which materially affected his general right to a fair and lawful trial.

The judgment and the order denying a new trial are reversed.

James, J., and Shaw, J., concurred.