[Crim. No. 4466.   In Bank.   Feb. 24, 1944.]

THE PEOPLE, Respondent, v. WILSON DE LA ROI, Appellant.

Nathan C. Coghlan for Appellant.

Robert W. Kenny, Attorney General, and T. G. Negrich, Deputy Attorney General, for Respondent.

SCHAUER, J.—In the year 1939 the defendant Wilson De La Roi was found guilty of murder in the first degree and was sentenced to imprisonment for life. In the pending action it has been found that such defendant, while serving his term of imprisonment at Folsom State Penitentiary, committed an assault with a deadly weapon (and with deadly effect) and with malice aforethought upon a fellow convict. The penalty for the latter offense is death (Pen. Code, § 4500), and from the judgment imposing that penalty this appeal comes to us automatically by the provisions of section 1239 (b) of the Penal Code.

The defendant urges five grounds for reversal which he states as follows:

"I. His first contention is that the information does not state a public offense, and that the Court had no jurisdiction over the subject of the information. . . . II. The evidence is insufficient in point of law to warrant the State of California in putting this appellant to death. III. The venue was never established in this case and consequently appellant is entitled to a new trial. IV. The Court erred

in stating to the jury at the conclusion of his instructions that they could not exercise their right to send out or to receive any communication. V. The Court erred in failing to instruct the jury that a verdict of guilty condemned the defendant to die.''

## Factual Background

The evidence, both direct and circumstantial, amply supports the verdict of guilty, but it discloses also certain circumstances pertaining to the investigation of the affair by prison officials and the treatment of prisoners who were known or believed to possess information relative to the occurrence, which have caused us to scan every word of testimony and every incident of procedure with most scrupulous care, not only to test the assignments of error made by the defendant but to lend independently our critical scrutiny to that of his able counsel in a search for any prejudice which could indicate a miscarriage of justice. The nature of such circumstances and treatment of prospective witnesses is such that any error whatsoever in the trial proceedings, which could reasonably have prejudiced the defendant, would require a reversal. After such scanning of the record and consideration of the defendant's arguments, we are satisfied, however, that only one of the points urged by the defendant—point IV above stated—shows error in any respect, and we are further satisfied that the error on that point could not, in the light of the other instructions, have prejudiced the defendant but must rather have tended to favor him.

William Deal was the victim of defendant's assault. On the 15th day of July, 1942, in broad daylight (between the hours of 1 and 2 p. m.), in the laundry building at Folsom prison, in the immediate or near presence of at least forty-five persons, including a trusty-guard and a prison official (the laundry superintendent), Deal was stabbed three times with a six-inch dagger, once in the right forearm, once in the left chest, and once in the left back near the waist. The wound in the right forearm was relatively superficial, as was that in the left chest. The one in the back made a deep penetration, severed a large vein, and caused death within a few minutes through abdominal hemorrhage. The wound in the left chest was not fatal because, although apparently directed at the heart, its force was somewhat spent and it was deflected by striking and penetrating a tin can which

was in the left breast pocket of the shirt which Deal was wearing. Further importance of the fact that Deal was wearing a shirt will appear later in this opinion.

When Deal was stabbed he screamed. According to the laundry superintendent (one of the few witnesses who was not a convict), it was "a very loud scream, or holler, such as a very unusual scream, it sounded as if someone was being actually murdered over and above the sound of the laundry. . . ." Deal not only screamed, he ran, endeavoring to escape, the defendant pursuing and "stabbing at" him. The laundry superintendent came to the door of his office (a room within the laundry building), someone called to the defendant to "beat it," and someone suggested to Deal that he sit down. The defendant walked out; Deal, having in his flight run into a dryer and fallen down, got up, walked to a table, sat down on it, and soon collapsed.

As previously mentioned, there was a convict guard, or trusty, stationed at the door of the laundry building, whose duty it was to permit no unauthorized person to pass through the door. The killer of Deal, with his weapon, apparently was permitted to leave the building unmolested and unrestrained. The guard at the door was not produced as a witness. Whether he was interrogated by prison officials does not appear. Even the identity of the guard is not revealed. Whether there was a record as to who was on duty at the time is not stated. The laundry superintendent testified, "Just as I came through the door [from his office into the main room of the laundry] . . . running toward the table where Deal, near where he had fallen, I observed this man because I was wondering why he had left the door open; it was open at the time and the fellows were coming and going. . . ." It does not appear that any order to close the door was given. Seemingly no witness who presumably knew the identity of the convict guard was willing to reveal it. Illustrative of the apparent attitude of all of the witnesses who were interrogated on that subject is the testimony of James Allen, one of the leading witnesses for the prosecution.

"Q. Isn't there usually a convict guard at that door? A. Yes, there is, but Mr. Roosevelt [the laundry superintendent] was in his office at the time that happened, and that time the door was open.

"Q. Isn't there usually a prisoner who acts as guard at that door? A. That is one thing I wouldn't say, because I was attending to my business.

"Q. You wouldn't say then there is or there is not a prisoner who stands guard at that particular door and lets people in and out? A. Yes, there is, yes, but I never seen him at that time. I couldn't say.

"Q. Your recollection now is that you don't remember whether there was a prisoner guard there or not, that is, a convict guard? A. I wouldn't say that, because I didn't see any—I wouldn't say that.

"Q. Do you know who the convict guard was at that door in the forenoon? A. No, I don't. I don't remember that."

It appears that clothing issued to prisoners was stamped with a number identifying it as belonging to the prisoner to whom it was issued. Whether this was required to be done as an incident of issue or only upon its being sent to the laundry does not appear. It is significant here because the dagger identified as the lethal weapon was found in a trash can on the prison grounds wrapped in a pair of trousers. The dagger was not examined for fingerprints and, so far as appears, the trousers were not examined for an identification mark. It does not appear whether any effort was made to ascertain the identity of the owner of the trousers or whether the trousers were marked with an identifying number. The record is also silent as to the source of manufacture of the dagger and as to how it came into the possession of an inmate of the prison. During the appreciable period of time which elapsed between the stabbing of Deal and his lapse into unconsciousness through loss of blood, no one appears to have asked him the name of his assailant.

Coupled to the above related circumstances are the added facts that all of the witnesses who identify defendant as the perpetrator of the crime are themselves recidivists and in the furnishing of information or the giving of testimony they were faced with a problem which involved personal interest. It appears that conditions in the prison were such that it was unsafe for any prisoner who had testified or given information to the prison officials against a fellow convict to be left in the main yard of the prison. Accordingly it was the practice to protect such prisoners by giving them more favorable working or living quarters outside the main yard. This practice was followed as to the principal prosecution witnesses. Also having a bearing upon the interest of witnesses, it appears that those prisoners who were deemed

by the prison officials to have been concerned in the commission, or in protecting the perpetrator, of the crime here involved, were placed in \solitary confinement shortly after the assault upon Deal and were kept there until the time of trial. This treatment was applied to several defense witnesses. Fairness to the defendant demands that we consider the points urged by him in the light of the circumstances related, and accordingly we so consider them, and in the order presented by defendant.

## The Law Points Presented

■ 1. *The Information States a Public Offense.* Defendant contends that the information upon which he is prosecuted fails to state a public offense in that it does not describe the deadly weapon used and hence it cannot be ascertained ''by what means of force the assault charged was committed.'' The information alleges that ''the said Wilson De La Roi on the 15th day of July, A. D. 1942, in the said County of Sacramento, in the said State of California, . . . being then and there a person undergoing a life sentence in . . . the State Prison at Folsom, did then and there willfully, unlawfully and feloniously and with malice aforethought commit an assault upon the person of William Deal with a deadly weapon or instrument and 'by means of force likely to produce great bodily injury. . . .'' Defendant relies upon statements in *People* v. *Perales* (1904), 141 Cal. 581 [75 P. 170]. That case was decided in 1904, long prior to the amendments of 1927 and 1929 of section 952 of the Penal Code, and no longer states the applicable rule of pleading in this state. (*People* v. *Mitchell* (1940), 40 Cal.App.2d 204, 209 [104 P.2d 545].) The section as amended expressly provides that an offense may be charged ''in the words of the enactment describing the offense or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused.'' The information fully meets the requirements of the present statute.

■ 2. *The Evidence Supports the Verdict.* Medical testimony establishes that William Deal, one of defendant's fellow inmates of Folsom State Penitentiary, died on July 15, 1942, from abdominal hemorrhage resulting from the severance of a large vein below the heart occasioned by a stab wound inflicted on the victim's back. The assault occurred in the prison laundry which occupies a building 92.5 feet

long by 48.5 feet wide situated within the prison grounds. Three eyewitnesses testified to seeing defendant with a knife in his hand actually engaged in stabbing or "stabbing at" or "cutting" the decedent. Other witnesses testified to seeing the defendant enter or leave the laundry at about the time of the assault. Two witnesses testified that after defendant came out of the laundry he placed something in a trash can on the outer grounds. Later, a dagger having a blade approximately six inches long and a pair of trousers in which it had been concealed, were recovered from the trash can. Another witness asserted that on the day preceding the assault he overheard defendant telling Deal that "he wanted his stuff [tobacco, which was used as a medium of exchange] and he didn't want no if or and about it." This witness added that a few hours before his death Deal had arranged to borrow from him (the witness) seventy sacks of "weed" with which to pay his debt to defendant. Weak and seemingly illogical as is this evidence of motive—the death of the debtor would surely in this case obviate any chance for collection of the debt—it may, nevertheless, reveal a basis sufficient to have roused the unbridled emotions of this defendant.

Defendant took the stand in his own defense and denied making the assault. He stated that he and the deceased were the best of friends (that they had been seen together often is corroborated by several witnesses) and that no debt existed between them. By his testimony defendant placed himself out in the yard at "the back gate," about 435 feet —the most remote point in the main yard—from the laundry, at the time of the assault. Certain inmates, called as witnesses by the defense, corroborated to some extent defendant's narration of events. Three of them agreed on one point: that at the time of the commission of the assault the defendant was at or near "the back gate." But their stories do not withstand careful analysis. One defense witness, Calvin Hanson, who admitted convictions for first degree robbery and for first degree burglary, testified that he saw Allen, a prosecution witness, follow Deal into the shower room, that he heard Deal yell, and that Allen then reappeared holding a knife and with "blood on his hands . . . dripping down," and that Deal did not reappear. This latter testimony not only was not corroborated by any other witness, but is thoroughly discredited by certain circumstances and other testimony. The witness insisted that *Deal was not*

*wearing any shirt,* "he was stripped to the waist," whereas it is well nigh indisputably established by other evidence that Deal was wearing a shirt and that a tin can in the left breast pocket of the shirt, through which one knife thrust passed, contributed to prevent that blow from being fatal. Further discrediting circumstances are the facts that this witness had never told this story to anyone—not even to counsel for the defense—prior to telling it on the witness stand, and that his story left the fatally wounded Deal out of sight in the shower bath, whereas every other witness to the scene of the actual stabbing, including the laundry superintendent, placed Deal in plain sight in the main laundry room. It is difficult to conceive how a witness could be more completely discredited than was this one.

Other witnesses, besides the defendant, who testified for the defense, include Eddie Walker, the defendant's cellmate, who admitted convictions for kidnaping, robbery, burglary, and escape from custody of an officer; John De La Roi (brother of defendant), who admitted convictions for burglary, first degree, burglary, second degree, and grand theft, and James Morgan, who admitted convictions for burglary, robbery of the first degree, and another robbery and kidnaping.

Eddie Walker, as previously mentioned, was defendant's cellmate at the time the offense was committed. His testimony, much more closely than that of any other witness, comports with that given by defendant. It is to be noted that the evidence for the prosecution tends to an appreciable extent to connect Walker with the defendant in the commission of the offense charged. Walker's testimony was to the effect that Deal, the defendant, and Walker, were the "best of friends," that no debt could exist among them, and that at the time of the assault the defendant was "down to the back gate"—that farthermost point in the main yard from the laundry building — talking with a trusty. The trusty, called as a witness, did not corroborate this testimony.

John De La Roi, defendant's brother, testified in substance that the defendant had played a game of handball with him "early in the afternoon" on July 15, and, like Walker, said that at the time of the assault the defendant was "down at the back gate" talking to a trusty. He also said that shortly before the stabbing he, the witness, *"got through playing handball"* and, being thirsty, went to a

point near the laundry to get a drink from a hydrant, where, through a window, he observed someone whom he did not recognize stabbing the decedent. The witness Morgan testified that he and the witness John De La Roi played handball on the day of the assault, with the defendant Wilson De La Roi keeping tally, but he differed materially from his co-witness John De La Roi in that according to Morgan the handball game "was probably half over, when I heard someone scream. . . . We stopped the game and walked over to see what was happening, Johnny De La Roi and I. . . ." Obviously if Morgan was telling the truth then John De La Roi was not near a window of the laundry looking in, when the assault occurred. About the only thing in which he agreed with John De La Roi was in placing the defendant *near the back gate* at the crucial time. He also said that the defendant engaged in playing handball with his brother that afternoon, but the defendant himself denied that he played handball on the day Deal was killed. Morgan likewise differed with the defendant in that Morgan testified that the defendant returned to the handball game and resumed keeping tally after the stabbing, while the defendant positively denied that he returned to the handball court after the assault.

While each of the witnesses for the prosecution who was at the scene of the crime, other than the laundry superintendent, stands convicted of multiple felonies, analysis and comparison of their several testimonies fail to reveal any fundamental or wholly irreconcilable inconsistencies. The evidence not only legally supports the verdict but in comparison with that offered by the defendant it appears overwhelming in persuasiveness.

■ 3. *Venue in the County of Sacramento Is Established by Proof that the Offense Was Committed within Folsom State Prison.* In his third contention defendant asserts that the venue of the offense was never established in that none of the witnesses testified that any of the events related by him occurred in the county of Sacramento. The transcript discloses, however, that some of the witnesses testified that the acts referred to in their testimony occurred at Folsom prison, and defense counsel stipulated "that Folsom Prison is situated within the County of Sacramento, State of California." ■ Moreover, as stated by the trial court, it could take judicial notice of the fact that Folsom prison is situated within the county of Sacramento. (Code Civ. Proc., §1875,

subd. 2; *People* v. *Wright* (1926), 79 Cal.App. 523, 525 [250 P. 204]; *People* v. *Bastio* (1942), 55 Cal.App.2d 615, 617 [131 P.2d 614].)

4. *It Was Error to Instruct the Jury Contrary to the Provisions of Section 1138 of the Penal Code, but It Appears that No Prejudice Therefrom Was Suffered by Defendant.* Defendant's fourth contention—the only one which has semblance of merit—is based on the last paragraph of the charge of the court. In closing his instructions to the jury the trial judge stated, ''I wish to say that from this time on, you will receive no visitors from any source whatever; *neither will you send out any communications nor will any be sent to your room. You have now all that is to be said in this case, by the respective parties and by the Court.* The case now remains with you.'' (Italics supplied.) Section 1138 of the Penal Code provides that ''After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the cause, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the district attorney, and the defendant or his counsel, or after they have been called.''

Obviously it was improper to admonish the jury, ''neither will you send out any communications. . . . You have now all that is to be said in this case, by the respective parties and by the Court.'' The jury had the right to send out a communication to the court at any time it saw fit and it had the right to have testimony read or further instructions given. But the fact that it had these rights does not show that it had any occasion, in this case, to use them; nor, even if we assume that it may have wished to exercise such rights and felt precluded therefrom, does prejudice to the defendant appear possible.

The instructions given in this case, other than the single one under discussion, comprise a charge which is generally a model of excellence. The charge as a whole is clear, complete, concise; the language is plain; the rules stated are simple. There is no point of law as to which, in reason, the jury could have *needed* further information. The trial was not protracted: the jury was empaneled on Monday, September 21, 1942; the verdict was returned on Thursday, September 24. The deliberations were not prolonged: the

jurors retired at 2:58 p. m. and returned into court one hour and fifty minutes later, at 4:48 p. m., with their verdict. They were polled and each declared the verdict to be his.

By the instructions which were given, the jurors were advised as to every element entering into the crime charged; they were not only given the statutory rule and definition as to burden of proof and reasonable doubt, but they were also told that "The defendant is presumed to be innocent, and this presumption attaches at the beginning of the trial and remains throughout all stages of the trial," that the plea of the defendant "puts in issue every material allegation of the information and charge, and it devolves upon the prosecution to establish beyond a reasonable doubt that he, the said defendant, is guilty of the crime charged against him in the information," and that "Each of the parties in this case is entitled to the *independent judgment of each juror.*" (Italics supplied.) In the light of these proper instructions as to the law governing their consideration of the case, it seems clear to us that the concluding instruction which purported to preclude the jury from asking for further information, if it prejudiced either party, must have tended to prejudice the plaintiff and favor the defendant, rather than vice versa. Under the instructions quoted, *if there was any material disagreement among the jurors as to the evidence* which, in the absence of the improper instruction, would have caused their asking to be brought into court for further information, such disagreement must certainly have tended to impede or prevent rather than to facilitate or cause arrival at a verdict of guilty. If any juror entertained a view of the evidence inconsistent with guilt beyond a reasonable doubt, he was told, it was his duty to vote for a verdict of not guilty. If this situation of disagreement had arisen and the jurors had felt precluded from asking to be brought into court and given further information, the verdict which was returned herein could never have been reached. With the jury instructed that each party was "entitled to the independent judgment of each juror," that the burden of proof was on the prosecution, and that the defendant was entitled to the benefit of any reasonable doubt, it seems apparent that any disagreement among the jurors as to either facts or law, as to which they might have wanted, but felt prohibited from asking, further information, would have tended to prevent, rather than to cause, a verdict of guilty.

We are satisfied, after an examination of the entire cause, including the evidence, that the error in the instruction noted has not prejudiced the defendant or resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½.)

■ 5. *The Record Shows that the Jury Was Informed that the Penalty for the Crime Charged Was Death.* Defendant's final contention—that the "Court erred in failing to instruct the jury that a verdict of guilty condemned the defendant to die"—is not supported in its factual base. The court read to the jury section 4500 of the Penal Code which provides that "Every person undergoing a life sentence in a State prison of this State, who, with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury, *is punishable with death."* (Italics supplied.)

For the reasons hereinabove stated the judgment is affirmed.

Gibson, C. J., Shenk, J., Curtis, J., Carter, J., and Traynor, J., concurred.

EDMONDS, J., Dissenting.—Considering the evidence in this case, I cannot concur in a judgment and sentence imposing the death penalty which rests upon a verdict. of jurors who were erroneously instructed by the trial judge concerning their duties. Certain circumstances concerning the investigation of the crime and the treatment of the witnesses, my associates agree, are such "that any error whatsoever in the trial proceedings, which could reasonably have prejudiced the defendant, would require a reversal." But they say that the instruction to the jury, although directly contrary to a statutory provision safeguarding civil rights and guaranteeing a fair trial, was not prejudicial. Their determination is based upon the assumption that any disagreement concerning the testimony "must certainly have tended to impede or prevent rather than to facilitate or cause arrival at a verdict of guilty." But that conclusion can be drawn only as to disagreement between the jurors which was not cleared up by further deliberations, that is disagreement which continued to the point of preventing concurrence in a verdict. The statute declares that during

the deliberations, if there be any disagreement between the jurors as to the testimony, they must be returned into court. Who can say that there was no disagreement as to the testimony in the present case? Or, if there was such disagreement, would the same verdict have been reached if the jurors had heard read to them the testimony upon the point in dispute?

As I read the record, it is quite unrealistic to suppose that when the jurors retired to consider their verdict in this case, each one of them was of the opinion that it pointed to the guilt of De La Roi beyond a reasonable doubt. The crime was committed in the laundry of Folsom penitentiary, yet no guard or prison officer testified as to the circumstances of the killing. The testimony of the felons who were called as witnesses for the prosecution is replete with conflicts and inconsistent with the physical facts of the attack as revealed by the wounds made on the body of the victim. And these witnesses testified against a background of uncontradicted evidence showing the preferential treatment accorded them, although admittedly the principal witness for the appellant was placed in solitary confinement shortly after the murder was committed and remained there until the day of trial.

The Constitution of California provides that a judgment of conviction may not be reversed "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in *a miscarriage of justice.*" (Italics ours.) (Cal. Const., art. VI, sec. 4½.) This provision "is equally applicable to cases where the acquittal or the conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied." (*People* v. *Wilson,* 23 Cal.App. 513 [138 P. 971].) And if when "the entire cause, including the evidence," has been examined, it appears that any erroneous procedure has prevented that fair trial which the Constitution guarantees, it is as much the duty of an appellate court to reverse a judgment of conviction as to affirm one in a case where the defendant's rights have been fully protected.

In the first decision construing the constitutional provision, it was pointed out that a defendant's claim of prejudicial error is to be considered in connection with the evidence upon which the judgment rests. "It is plain, of

course,'' said this court, ''that the evidence in a case while technically sufficient to sustain a finding of guilt, may be so unsatisfactory as to render what in a plain case would be an absolutely harmless error one of vital importance, one affording ample ground for the conclusion that it has resulted in a miscarriage of justice.'' (*People* v. *Fleming,* 166 Cal. 357, 371 [136 P. 291, Ann.Cas. 1915B 881].) As epitomized in *People* v. *Keaton,* 211 Cal. 722, 724 [296 P. 609], the theory of the constitutional provision is ''that where there is a strong conflict in the evidence, any substantial error in the proceedings might tip the scales and prejudice the rights of the defendant.''

The evidence in the present case certainly does not point unerringly to the appellant's guilt. The prison duties assigned to him did not require that he be in the laundry room where the stabbing occurred. And, as stated by Mr. Justice Schauer, although there was a convict guard, or trusty, stationed at the door of the laundry building, whose duty it was to permit no unauthorized person to pass through the door . . . the guard at the door was not produced as a witness. . . . Even the identity of the guard is not revealed, [and] . . . during the appreciable period of time which elapsed between the stabbing of Deal and his lapse into unconsciousness through loss of blood, no one appears to have asked him the name of his assailant.''

Adding to the difficulty of determining who killed Deal is the conflict between the testimony of the witnesses who described the attack upon him and the undisputed medical testimony. As described by a physician, Deal was stabbed three times. One wound, in the right forearm, was not a mortal injury. Another, in the breast, was somewhat superficial because the dagger, deflected by a tin can in the breast pocket of his shirt and also by a rib, did not penetrate sufficiently to reach the heart. The third wound, about six inches deep, on the left side of the back, caused death.

Because of the nature and extent of these wounds, it is obvious that the witness Allen's account of the attack is far from accurate. According to his story of the encounter, the cuts on Deal's forearm and below his heart must have been made prior to the stab in the left side of the back which caused death and while Deal and De La Roi were face to face.

Yet it is difficult to believe that a man such as Deal, for many years accustomed to the grim realities inherent in a convict's life, would, after an assailant had stabbed him twice, turn away and leave his back undefended before his enemy.

There are many other unexplained inconsistencies in the testimony presented by the State. For example, according to the testimony of one prosecution witness, the sound of scuffling feet attracted his attention to the altercation, yet he heard no outcry, as did the laundry superintendent still farther away. And, according to the testimony of two of the witnesses who were closest to Deal when he was stabbed, De La Roi left the laundry with only a knife in his hand and was not carrying a pair of trousers, whereas three others said that he carried a pair of trousers or a bundle under his arm or in his hand.

In connection with these inconsistencies, certain evidence concerning the manner in which prison authorities treated the convicts who were to be called as witnesses should be noted. As stated in the majority opinion, ''a problem which involved personal interest'' faced all of the witnesses who identified the appellant as the perpetrator of the crime. One of them, Trauger, quite frankly told the jury that since the stabbing, ''I have been living in a small building down at the sewage plant . . . I can have the lights on any time I see fit, and listen to the radio on nights as late as ten o'clock . . . and I am away from the crowd . . . I don't have to do any kind of work.'' Allen was also assigned to these quarters two or three days after he was questioned by the prison officials. But the treatment accorded prisoners who did not accuse De La Roi of the crime was quite different. Mr. Justice Schauer summarizes the record in this regard, pointing out that ''prison officials placed in solitary confinement convicts who testified in defendant's behalf . . . and [they] were kept there until the time of trial.''

The appellant took the stand in his own defense and declared his innocence of the crime charged. With Eddie Walker, his then cell-mate, he told the jury, he and Deal went in for the midday meal and sat together. He did not go to the laundry afterward and was not in the laundry when Deal was attacked. Fellow convicts called on behalf of the appellant corroborated much of his testimony.

Considering the evidence as a whole, the testimony of the witnesses for the State is inconsistent in some respects, and inconclusive so far as presenting an eyewitness account of the killing which squares with the physical facts shown by the record. Against it stand the statements of two persons who corroborate the appellant's story that he was not in the laundry when the crime was committed and the uncontradicted accounts of the treatment accorded the witnesses by the prison officials.

Moreover, there is the entire lack of evidence concerning the trousers in which the dagger is said to have been wrapped and the ownership of the weapon. From the record it may be inferred that a guard took these articles from the trash barrel. But he was not called as a witness, no attempt was made to connect the appellant with the trousers, and there is no explanation of the reason why the dagger was not examined for fingerprints.

To ascertain the truth from this irreconcilable mass of testimony was probably not an easy task for the jurors. And if any one of them was in doubt of De La Roi's guilt because of inability accurately to recall the evidence upon a particular point, he was confronted with the court's statement that the jury now had "all that is to be said in this case, by the respective parties and by the court." My associates say that if there was any disagreement between the jurors and they "had felt precluded from asking to be brought into court and given further information, the verdict which was returned herein could never have been reached." But, as has been stated, disagreement between the jurors may have been overcome by persuasion when, except for the instruction, it would have been resolved by a further consideration of the evidence. Under such circumstances, the rule stated in the recent case of *People* v. *Dail,* 22 Cal.2d 642 [140 P.2d 828], to me compels a determination that the challenged instruction was prejudicially erroneous. Speaking for the court, the Chief Justice there said: ". . . in a close case where the evidence is sharply conflicting, substantial and serious errors vital to defendant that may have resulted in a miscarriage of justice must be regarded as prejudicial and grounds for reversal." This language is practically the same as that used in *People* v. *Silver,* 16 Cal.2d 714 [108 P.2d 4]. By another recent decision it was held

that the failure to give a cautionary instruction was prejudicial where "a different verdict would not have been improbable had the error not occurred." In conclusion, the court declared: "In view of the circumscribed extent of the acts alleged and the inconsistencies in the witness' testimony, it is doubtful whether the same verdict would have been rendered had the cautionary instruction been given." (*People* v. *Putnam,* 20 Cal.2d 885, 892 [129 P.2d 367].)

According to the rationale of these cases, prejudice is sufficiently established under article VI, section 4½, where the evidence of guilt, as shown by the record, is not clear and convincing and an error is made in an instruction vital to the defense or which may have deprived the defendant of the fair and impartial trial guaranteed by law. The record in the present case fully meets each of these requirements; accordingly I see no escape from the conclusion that the challenged instruction was prejudicial to the appellant, within the meaning of the constitutional provision.

For these reasons, I believe that the judgment should be reversed and the cause remanded for a new trial.

Appellant's petition for a rehearing was denied March 23, 1944. Edmonds, J., voted for a rehearing.